Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANNE HAUSRATH, JOHN WHEATON, JOANIE FAUCI, MEG FEREDAY, ROGER ROSENTRETTER, KATHRYN RAILSBACK, DALE REYNOLDS, and GREAT OLD BROADS FOR WILDERNESS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE AIR FORCE, <br><br> Defendant. | Case No. 1:19-cv-103 <br><br> **COMPLAINT** |

## INTRODUCTION

1.     This case challenges the "Urban Close Air Support Air and Ground Training Project" (Urban CAS Training Project) recently approved by Defendant United States Department of the Air Force (Air Force) that establishes a permanent urban military training program centered over nine cities across southern Idaho, from Boise to Burley. The Urban CAS Training Project would authorize thousands of annual overflights of F-15 military jets, coupled

with on-the-ground troop activity within the cities, occurring day and night for up to 160 days per year.

2.    The Urban CAS Training Project endangers the health, safety, and quality of life of Idahoans, as well as birds and wildlife. Hundreds of thousands of residents in Boise and other cities and towns in southern Idaho would be exposed in their homes, work places, and popular recreation areas to disruptive jet noise with the potential to interrupt sleep cycles, interfere with work and school, and otherwise harm their quality of life.

3.    Despite the extraordinary and unprecedented reach of the training activities, the Air Force approved the project without preparing a full Environmental Impact Statement (EIS) as required by the National Environmental Policy Act (NEPA). Instead, the Air Force relied on a November 2018 Final Environmental Assessment (Final EA) and Finding of No Significant Impact (FONSI) to assert there would be no significant impacts.

4.    In preparing the Final EA and FONSI, the Air Force failed to provide adequate public notice and opportunity to comment on its proposed Urban CAS Training Project, and never even responded to many public comments—from Plaintiffs and others—underscoring the potentially significant impacts that the Air Force's military overflights and associated on-the-ground activities pose for the citizens of Boise and southern Idaho, and to migrating birds and other wildlife. The Final EA and FONSI also failed to examine various potential risks and reasonable alternatives to the selected action, among other flaws identified by public comments.

5.    Because the Air Force violated NEPA in approving the Urban CAS Training Project based on the inadequate Final EA and FONSI, and without preparing a full EIS, the Court should reverse and remand with instructions to prepare a fully NEPA-compliant EIS.

**JURISDICTION AND VENUE**

6.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1346 and 1331 because this action involves the United States as defendant and arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701 *et seq.*; NEPA, 42 U.S.C. §§ 4321 *et seq.*, the Equal Access to Justice Act, 28 U.S.C. §§ 2214 *et seq.*; and applicable regulations.

7.      An actual, justiciable controversy exists between Plaintiffs and the Air Force. The requested relief is proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–706. The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, one or more Plaintiffs reside in this district, and the affected lands and resources in question are located in this district.

9.      The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

**PARTIES**

1.      Plaintiff ANNE HAUSRATH is over 18 years old and a resident of Boise, Idaho.

2.      Plaintiff JOHN WHEATON is over 18 years old and a resident of Boise, Idaho.

3.      Plaintiff JOANIE FAUCI is over 18 years old and a resident of Boise, Idaho.

4.      Plaintiff MEG FEREDAY is over 18 years old and a resident of Boise, Idaho.

5.      Plaintiff ROGER ROSENTRETTER is over 18 years old and a resident of Boise, Idaho.

6.      Plaintiff KATHRYN RAILSBACK is over 18 years old and a resident of Boise, Idaho.

COMPLAINT – 3

7.     Plaintiff DALE REYNOLDS is over 18 years old and a resident of Boise, Idaho.

8.     Plaintiff GREAT OLD BROADS FOR WILDERNESS is a national, non-profit organization, led by women, that engages and inspires activism to preserve and protect wilderness and wild lands. The organization has a grassroots chapter located in Boise, Idaho, known as the Boise Broadband. Formed in 1989, Great Old Broads now has over 3500 members in all 50 states who believe that wild places are valuable in their own right, who value the spirt and intent of national conservation legislation such as the Wilderness Act and the National Environmental Policy Act, and who support sound science as a basis for informed decisions. A primary goal of Great Old Broads is to ensure that there will still be remote, untrammeled places left not just for our own grandchildren, but for those of all species. The organization has worked to protect the Owyhee Canyonlands in southwestern Idaho, the last great unprotected expanse of the American West, and other treasured public lands that may be impacted by the Urban CAS.

9.     Plaintiffs participated in the Air Force decision-making process by attending public meetings pertaining to the project and/or commenting on the Draft Environmental Assessment for the project.

10.    Plaintiffs and Great Old Broads' members and supporters live, work, recreate, and otherwise use and enjoy the areas—including their private properties and public lands—that will be impacted by the Urban CAS Training Project, and will suffer irreparable injury as a result of the Air Force's unlawful actions. The Air Force's NEPA violations increase the risk that the significant environmental impacts of the Urban CAS Training Project will be overlooked, causing unnecessary interference with their health, recreation, and quality of life.

11.    Such injuries will be redressed by the relief sought herein. Requiring the preparation of an EIS—one that fully and properly analyzes the environmental impacts of Urban

CAS Training Project, reasonable alternatives, and public input—will increase the likelihood that the Air Force will avoid or mitigate the adverse impacts of the Project.

12.     Plaintiffs have no adequate remedy at law to address the foregoing injuries to their interests.

13.     Defendant UNITED STATES DEPARTMENT OF THE AIR FORCE is a Military Department within the United States Department of Defense and is responsible for the administration and operation of the United States Air Force. Defendant Air Force conducted the defective NEPA public process for the Urban CAS Training Project, and issued the Final EA and FONSI challenged here on November 7, 2018.  The FONSI was signed by Colonel Joseph Kunkel, Wing Commander, 366th Fighter Wing, Mountain Home Air Force Base, Idaho.

## NEPA'S REQUIREMENTS

14.     Congress adopted NEPA to "encourage productive and enjoyable harmony between man and his environment," and "to promote efforts which will prevent or eliminate damage to the environment and biosphere," among other stated purposes. 42 U.S.C. § 4321.

15.     The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. §§ 1500 *et seq.* The Air Force has also adopted its own regulations implementing NEPA. 32 C.F.R. §§ 989 *et seq.*

16.     Public participation and intergovernmental consultation are paramount to the NEPA process. NEPA's goals are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c).

17.     To that end, NEPA's implementing regulations require federal agencies to encourage and facilitate public involvement "to the fullest extent possible," *id.* § 1500.2, and identify public scrutiny as an "essential" part of the NEPA process, *id.* § 1500.1(b). *See also id.* § 1501.4(b) (Agencies must "involve . . . the public, to the extent practicable"); *id.* § 1506.6 ("Agencies shall: . . . (a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures" and give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "solicit appropriate information from the public.").

18.     The scope of NEPA review is quite broad. Federal agencies must, among other things, analyze all direct, indirect, and cumulative effects of a proposed action and its alternatives on ecological, aesthetic, historic, cultural, economic, social, and health interests. *Id.* §§ 1508.7, 1508.8.

19.     Direct effects include those that "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).

20.     Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

21.     Cumulative effects result from incremental impacts of the action when added to all other past, present, and reasonably-foreseeable future actions regardless of what agency or person undertakes such other actions. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions."  *Id.*

22.     The consideration of alternatives is also at the heart of NEPA review. Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their

having been eliminated"; "[d]evote substantial treatment to each alternative considered in detail including the proposed action"; and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." *Id.* § 1502.14(a)–(c); *see also* 32 C.F.R. § 989.8 (Air Force NEPA regulations requiring it to evaluate the impacts of all "reasonable alternatives to the proposed action and the 'no action' alternative").

23.     NEPA requires that federal agencies must prepare an Environmental Impact Statement (EIS) for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C)(i).

24.     An EIS must include, *inter alia*, a detailed statement of: (1) the environmental effects—including direct, indirect, and cumulative effects—of the proposed action; (2) any adverse environmental effects that cannot be avoided if the proposed action is implemented; (3) reasonable alternatives to the proposed action; and (4) mitigation measures to minimize any significant effects identified. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.10, 1502.14, 1502.16.

25.     To determine whether potential adverse effects are significant enough to warrant an EIS, the agency may prepare a more brief Environmental Assessment (EA). 40 C.F.R. § 1508.9(a).

26.     If the agency determines from the EA that no EIS is required, it must document that determination in a Finding of No Significant Impact (FONSI). The agency's EA and FONSI must provide a "convincing statement of reasons" why the project's impacts are insignificant. 40 C.F.R. §§ 1501.4, 1508.9, 1508.13.

27.     In so doing, an EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40

C.F.R. § 1508.9(a)(1). This includes a discussion of cumulative impacts. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895–896 (9th Cir. 2002). "Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

28.     In evaluating the "significance" of an environmental impact for purposes of determining whether an EIS is required, federal agencies must consider, *inter alia*:

(1) "[t]he degree to which the effects . . . are likely to be highly controversial";

(2) "[t]he degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks";

(3) "[t]he degree to which the action may establish a precedent for actions with significant effects or represents a decision in principle about a future consideration";

(4) whether the action may result in significant cumulative effects; and

(5) "[t]he degree to which the action may adversely affect an endangered or threatened species or its critical habitat." 40 C.F.R. § 1508.27(b).

29.     If the EA indicates that the federal action may significantly affect the quality of the human environment, or if "substantial questions are raised" as to whether a proposed federal agency action may have a significant effect on some human environmental factor, then the agency must prepare an EIS. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006); 40 C.F.R. § 1501.4(c). "This is a low standard." *Klamath*, 468 F.3d at 562.

30.     Thus, in challenging a federal agency's decision not to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur"; rather, a plaintiff need only raise "substantial questions whether a project may have a significant effect." *Id*.

31.     An agency's decision not to prepare an EIS will be found invalid if the agency has failed to "take a hard look at the environmental consequences" of its action, the agency's analysis is not "based on a consideration of the relevant factors," or "the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Metcalf*, 214 F.3d at 1141–42.

32.     NEPA's implementing regulations also provide that the agency shall ensure the scientific accuracy and integrity of environmental analysis . Agencies "shall identify any methodologies used[,] and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions." 40 C.F.R. § 1502.24. The agency's environmental information "must be of high quality." *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

33.     The agency also must disclose if information is incomplete or unavailable, and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1).

34.     The Air Force NEPA regulations expressly require consideration of environmental justice during the NEPA process. *See* 32 C.F.R. § 989.33 (requiring compliance with Executive Order 12,898, which directs agencies to identify and address disproportionate adverse impacts of their activities on minority and low in come populations).

35.     The Air Force must publish notice of its EA and FONSI in a "in a prominent section of the local newspaper(s) of general circulation" under an array of circumstances, including when the proposed action is a change to airspace use or designation. 32 C.F.R. § 989.24.

## STATEMENT OF FACTS

**Overview of the Air Force's Urban CAS Training Project**

36.     According to the Final EA and FONSI, the Air Force's Urban CAS Training Project will involve military training exercises conducted in major urban centers across southern Idaho, including the greater Boise metropolitan area and Twin Falls, as well as Burley, Glenns Ferry, Bruneau, Hammett, Grand View, Mountain Home, and the Mountain Home Air Force Base.

37.     Urban CAS Training Project will involve repeated overflights by F-15 jets and coordinated operations by military personnel on the ground. The training operations will use existing American F-15E and Singaporean F-15SG aircraft and flight teams operating out of Mountain Home Air Force Base, located in southwestern Idaho.

38.     The selected action will involve up to 160 "Training Events" each year for an indefinite number of years. Each "Training Event" would entail a collection of "Training Operations"—up to 400 in a given year—that would take place within a single urban area on a given day.

39.     Before each of the "Training Operations" begins, and during any operational hand-offs between pairs of jets, two or four jets will begin flying in a circular holding pattern maintaining a fifteen-nautical-mile distance from an urban center. They will circle the urban center an estimated three times an hour for an unknown period of time.

40.     The Final EA describes this holding pattern as occurring on the outskirts of town, but in Boise, for instance, the holding pattern would be directly over major population centers including Meridian, Eagle and Nampa; the Snake River Birds of Prey National Conservation Area; and would impact numerous popular recreation areas including the Boise Foothills.

COMPLAINT – 10

41.     The holding patterns around other urban areas identified in the CAS Project, including Twin Falls, Mountain Home, Glenns Ferry, Grandview, and Bruneau, will also occur over sensitive wildlife habitats and public lands, including the Bruneau-Jarbidge Rivers Wilderness, Big Jacks Creek Wilderness, Little Jacks Creek Wilderness, the King Hill Creek Wilderness Study Area, and the Owyhee Canyonlands region.

42.     Once the military jets are in their holding patterns, a convoy of up to five vehicles and twenty soldiers will enter the urban center and act as the "Opposing Forces," while a convoy of up to five vehicles and twenty soldiers would act as the "Friendly Forces." These convoys will be comprised of both American and Singaporean forces and they will drive unmarked cars, travel through public spaces, and be disguised as plainclothes civilians.

43.     To begin a mission scenario, the Friendly Forces will communicate by radio with the F-15 jets above for help locating the Opposing Forces, which the aircraft will then track and target with training lasers.

44.     The Air Force claims that such lasers are "eye safe" so long as they are set to the proper strength and not magnified by telescopes, telephoto lenses, or similarly strong magnifying devices.

45.     During a "Training Operation," aircraft will fly over the urban center at an altitude of 10,000 to 18,000 feet above ground level for up to ninety minutes at a time. Each "Training Operation" is followed by a two- to three-hour break before another mission, resulting in an estimated maximum of six hours of flight over an urban center during a "Training Event."

**Urban CAS Training Project History**

46.     The Air Force first opened the Urban CAS Training Project to stakeholder review in February 2018 through a thirty-day public scoping period.

47.     Upon information and belief, at some point prior to the completion of the scoping period, the Air Force began conducting Project training operations over the urban centers without first completing NEPA review.

48.     This indicates that the Air Force pre-determined its decision to approve the CAS Urban Project.

49.     Despite the vast scope of the Project and the potentially impacted population, the Air Force did little to notify or seek input from the public during this scoping period. The only notice provided to the general public was a Draft Description of the Proposed Action on the Mountain Home AFB website.

50.     Additionally, the Air Force provided notice of the scoping period to state and local government entities, federally recognized Tribes, and nine environmental groups. Major affected cities such as Meridian, Eagle, and Garden City received no formal notice of the scoping period.

51.     Immediately following the scoping period, the Air Force scheduled a series of seven public scoping meetings without widely publicizing the fact. The meetings were to take place in Twin Falls, Glenns Ferry, Grandview, Eagle, Meridian, Mountain Home, and Boise. The Air Force failed to propose meetings at several of the other urban centers selected to be the center of training operations, let alone any of the major or outlying areas that fall within the fifteen-nautical-mile training radius. Moreover, several of the meetings took place during the 9:00 a.m. – 5:00 p.m. workday, making it difficult for many individuals to attend.

52.     Further dissuading public participation, the Air Force cancelled and then rescheduled the last four of these meetings, cancelling the Boise meeting on the very day it was

to be held. Subsequently, the Air Force was forced to extend the scoping comment period deadline to ensure most of the meetings took place before it was closed.

53.     On September 14, 2018, the Air Force issued a Draft EA and permitted a thirty-day public comment period. Because of delays in making the supporting documents available to the public, the Air Force extended the comment period deadline by six days.

54.     The Air Force only published notice of the Draft EA's availability in two town newspapers, failing to cover major newspapers such as the Times-News of Twin Falls. Despite the broad scope of the project across major Idahoan cities, the Air Force failed to mail any notice to potentially affected individuals.

55.     Plaintiffs timely submitted extensive comments on the Draft EA. These comments noted several major problems with the Draft EA, and specifically underscored that an EIS is required for a proposal as dangerous, controversial, and novel as this one.

56.     Plaintiffs' comments also detailed numerous ways that the Draft EA failed to take a hard look at the impacts of the proposal; failed to consider a reasonable range of alternatives; and failed to adequately notify and involve the public and government officials.

57.     It appears that at least 160 individuals and organizations commented on the Urban CAS Draft EA. This number is an underestimate as Great Old Broads' name and comment was missing from the Comment Response Matrix in Volume II of the Final EA and other comments may be missing as well. The vast majority of comments expressed concerns with the Air Force's failure to consider reasonable alternatives, failure to notify the public and allow full public participation, and failure to fully consider the proposal's impact on sleep, health, and the environment.

58.     On November 7, 2018, the Air Force released the Final EA and the signed FONSI for the Urban CAS Training Project. The Air Force failed to provide notice of this fact to all interested parties, including those who specifically requested to be notified of the availability of the Final EA, as required by NEPA. Additionally, the Air Force failed to respond to or correct the deficiencies identified in numerous public comments received on the Draft EA.

**Key Defects in Final EA and FONSI**

*Sleep Disturbance from Aircraft Noise*

59.     The Air Force's Final EA relied exclusively on a static Sound Exposure Level (SEL) threshold to gauge the impact of overflights on human sleep. SEL is the total amount of sonic energy caused by a single noise event, accounting for intensity and duration, expressed as a weighted dBA over one second.

60.     The Air Force stated that the threshold for human sleep interference is an SEL of 90 dBA, which presumes a 25 dB noise reduction attributable to a building envelope. Because the Air Force predicted that the SEL of Urban CAS Project training would not exceed 72.3 dBA, the Final EA concluded that the Urban CAS Training Project will have negligible impacts on sleep. But there are several key flaws with this analysis of sleep impacts.

61.     First, the chosen sleep interference threshold of 90 dBA presumes a 25 dB noise reduction attributable to a building envelope, and therefore measures only the probability of awakening individuals who are sleeping indoors. Anyone sleeping outside or in a tent would experience sleep interference at an SEL of just 65 dBA, well below the projected SEL for the Urban CAS Training Project. The Air Force failed to acknowledge or consider the Project's likely impacts on the homeless population and those recreating and camping outside.

COMPLAINT – 14

62.    Second, the Air Force failed to analyze how a full night of flyovers—as opposed to a single flyover—would impact sleep. The Air Force's selected SEL metric only indicates the threshold at which a single noise event is likely to awaken individuals from sleep.

63.    Repeated noise events, such as those proposed, are known to substantially increase the likelihood of awakening at any given decibel level. *See, e.g.*, Department of Defense Noise Working Group, *Using Supplemental Noise Metrics and Analysis Tools* 17 (2009). Nonetheless, the Air Force failed to provide any data on the number of times aircraft would fly over a given location during any given night of trainings, or to analyze the impacts of repeated flyovers.

64.    Third, the Final EA only addressed the potential negative impact of overflights fully waking civilians, and it failed to consider other well-documented impacts of nighttime noise, such as impaired or delayed sleep, which can have serious health and economic impacts.

*Speech Interference from Aircraft Noise*

65.    The Air Force used an analysis of the Maximum Sound Level ("$L_{max}$")—the max dBA at a single point in time—to determine the impact of individual flyovers on speech and communication. The Final EA estimated that the $L_{max}$ of individual flyovers will not exceed 59.3 dBA and asserted that aircraft noise will not interfere with communication unless the $L_{max}$ is over 75 dBA.

66.    Similar to the Air Force's analysis of sleep, there are several key flaws with its analysis of the impact of overflights on conversations.

67.    Many of the flaws are identical to the problems noted above in regard to sleep disturbance, because the 75 dBA standard for speech interference assumes 25 dBA of protection

COMPLAINT – 15

from being indoors. Outdoor speech interference can occur at just 50 dBA, a level well below the stated 59.3 dBA $L_{max}$ for the Urban CAS Training Project.

68.     Thus, the Urban CAS Training Project has the potential to interfere with the communications of anyone spending time outside in Boise or other parts of southern Idaho— outdoor workers, hikers and runners, students on field trips, audiences at outdoor amphitheaters, and customers dining on patios. Outdoor conversations are incredibly common, and interference with them can cause as much or more annoyance and stress as noise indoors. Nevertheless, the Air Force failed to discuss interference with outdoor conversations at all in the Final EA's analysis of speech interference.

*Noise Pollution and Community Annoyance*

69.     The Air Force further failed to consider potential impacts to the quality or characteristics of the soundscapes within and around the selected urban centers, and the annoyance such impacts will cause.

70.     To assess potential soundscape impacts, the Air Force estimated the cumulative impacts of aircraft noise on each urban center using the Day-Night Sound Level (DNL)—the average dBA level in a 24-hour period with a 10 dBA penalty added to noise between 10:00 p.m. and 7:00 a.m. This DNL was then compared to the background noise levels in the impacted areas. For this analysis, the Final EA grouped the targeted urban centers into three categories by size and estimated the background noise level, calculated as DNL, within each as follows: large, 57 dBA; medium, 52 dBA; and small, 40 dBA.

71.     Against this backdrop, the Final EA stated that a modeling program showed the DNL for the Urban CAS Training Project will never exceed a 37 dBA DNL and will thus have no impact on the soundscape of the urban center at all. The Final EA cited studies from 1974,

1978, and 2003 to claim less than one in ten million people will be annoyed by this sound level, also asserting that the sound will "blend naturally with the existing soundscapes in these areas.".

72.     However, merely stating that a model predicted there would only be minor noise impacts from the training is insufficient to meet the "hard look" requirement of NEPA. The Air Force failed to disclose any of the variables in height, speed, or flight pattern used to produce this model and did not disclose if the calculation considered changes in elevation, weather, ground impedance, or other pertinent variables which affect the noise caused by overflights. It also failed to disclose whether the projected DNL was based only on operational days or was based on a calendar year, such that non-operational days might artificially depress its noise predictions.

73.     Moreover, the Air Force's claims that the aircraft noise will "blend" into existing soundscapes is unsupported by the record and fails to consider important variables.

74.     The Air Force relies on gross generalizations of the background noise levels of each urban center and ignored the nuances of each area. This is illustrated by the fact that the Air Force estimated the ambient background noise in Mountain Home AFB, with an estimated population of 3070, is identical to the background noise in the city of Grand View, which only has an estimated population of 390.

75.     Moreover, even if the Air Force's background noise estimates are appropriate for the true urban core of each chosen city, they fail to account for the surrounding natural, recreational, and wildlife areas, which have a far lower background noise levels.

76.     The City of Boise and other impacted urban centers include large swaths of public lands and foothill trails whose natural and even wilderness characteristics—including their naturally quiet soundscapes—are highly valued. These areas lack the elevated background noise

levels associated with commerce, commercial and residential traffic, inflated populations, and the other trappings of urban life. Visitors to these areas expect to be able to escape the sights and sounds of modern life, and the roar of F-15s passing overhead will impair their ability to enjoy these natural resources. This means that aircraft noise will be far more audible and cause more annoyance than the Air Force examined in the Final EA.

77.     Sister federal agencies have provided a much more nuanced understanding of the urban-rural soundscape. For example, the National Park Service (NPS) Natural Sounds and Night Skies Division has modeled background sound levels across the country using an $L_{50}$ metric during the summer daytime, which establishes the sound level that is exceeded in that area 50% of the day. *See* NPS, *Geospatial Sound Modeling, 2013-2015*, https://irma.nps.gov/DataStore/Reference/Profile/2217356. The NPS's soundscape modeling shows that noise in areas such as downtown Boise is orders of magnitude more intense than quiet parts of the foothills. Although this more granular analysis was available to the Air Force during its NEPA review process, the Air Force never considered this scientific information in concluding that soundscape impacts will be minimal.

78.     Even using the Air Force's inflated calculations of the background noise levels, the aircraft noise from the Urban CAS Training Project will be clearly audible. The Air Force estimates that aircraft flyovers for this Project will produce an $L_{max}$ of up to 59.3 dBA. That is an order of magnitude louder[1] than the background noise in the five smaller cities and exceeds the estimated background noise levels in Boise by almost 5 dBA—a significant difference. It will most certainly not fade into the background for residents or visitors enjoying the great outdoors in these quiet areas.

_____

[1] A 10 dB increase of a sound doubles its perceived loudness

COMPLAINT – 18

79.     Finally, the exclusive use of the DNL metric, which averages noise over a 24-hour period, to measure community annoyance is problematic because of the intermittent nature of aircraft noise from the Urban CAS Training Project. The Air Force failed to account for the increased annoyance of sounds that are sporadic and occur at random times. Additionally, the Air Force failed to consider that noise is likely more annoying when it is unexpected and out of place. Therefore, a hiker is far more bothered by an overflight than someone downtown expecting man-made disturbances.

*Environmental Justice*

80.     Executive Order 12,898 requires federal agencies to determine whether a project will have a disproportionately adverse effect on minority and low-income populations. 59 Fed. Reg. 7629 (Feb. 16, 1994); *see* 32 C.F.R. § 989.33 (Air Force NEPA regulation codifying the requirements of E.O. 12,898).

81.     To accomplish this, an agency must determine whether the impacted area contains a disproportionately high percentage of low-income or minority residents, as compared to an appropriate unit of comparison (e.g., the entire state). The agency must also consider whether low-income and minority residents are otherwise more susceptible to the adverse impacts than the general population. *See* Council on Environmental Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act* 26 (1997).

82.     The Final EA arbitrarily concluded that the Urban CAS Training Project will not disproportionately impact minority and low-income populations. The Air Force first asserts that the training areas are comprised of less than 50% low-income and minority residents and that every population within the training areas "would be equally as likely to experience effects." This argument failed to consider whether the proportion of low-income and minority residents,

COMPLAINT – 19

even if less than 50%, is nonetheless "disproportionately higher" than a relevant community of comparison.

83.     The Air Force also failed to consider whether differences in housing characteristics may cause greater indoor noise impacts on low-income communities. For example, less insulation, single-paned windows, poor-quality construction, and open windows in the summer may increase exposure to aircraft noise. The homeless would also face an even greater exposure to the noise.

84.     Second, the Air Force restated its false claim that there will be no effect on any population whatsoever, thus arguing that no group could be disproportionately impacted. In truth, the Urban CAS Training Project poses significant adverse impacts, particularly on those, such as the homeless, who face greater exposure to the noise.

*Other Health and Quality of Life Impacts of Aircraft Noise*

85.     The Final EA also failed to meaningfully and fully analyze the adverse effects that noise can have on health. Additionally, although the Final EA touched on the potential for aircraft to be annoying, it failed to address other quality of life issues that can be impacted by aircraft noise, such as stress and mental health.

86.     In addition to hearing loss, interrupted sleep, and disturbed communication, there is evidence that elevated noise levels may increase rates of dementia, depression, diabetes, obesity, hypertension, heart disease, heart attacks, strokes**,** and other adverse cardiovascular effects. The Final EA examined none of these numerous health risks, even though many of them were directly raised as comments during the scoping period or on the Draft EA.

87.     The Air Force also failed to analyze whether the Urban CAS Training Project will have an impact on sensitive urban areas, such as schools, hospitals, churches, cemeteries, and

other quiet public spaces. Communication and quiet contemplation at places such as these is particularly important and vulnerable to disturbance.

88.     The Air Force asserts that so long as the DNL of aircraft noise remains under 65 dBA, flights are acceptable over all noise-sensitive land. But, as discussed above, the Air Force's DNL calculations are flawed and based upon unexplained modeling and assumptions.

89.     Furthermore, the Air Force did not take a hard look at the other ways noise can impact children besides impairing communication in the classroom. Noise itself can have a serious detrimental effect on children, potentially impacting their reading comprehension, memory, psychological health, and ability to learn new material. *See, e.g.*, Aviation Environment Federation, *Aircraft Noise and Public Health: The Evidence is Loud and Clear* (2016); Civil Aviation Authority, *Aircraft noise and health effects: Recent findings* (2016). The Final EA failed to examine these factors.

*Non-Auditory Health Impacts*

90.     The Final EA also failed to examine important questions about the health impacts of targeting lasers or the psychological impact of visible military activity in civilian areas, whether on veterans or non-veteran, civilian community members.

91.     The Final EA asserted that the lasers will have no human health impacts, yet acknowledged that the lasers can cause severe eye damage if viewed through telephoto lenses and other strong magnifiers. Telephoto lenses are frequently used in photography during both the day and night, with astro-photographers frequently pointing their lenses at the sky or using telescopes. The chance of a laser hitting a lens may be low, but the risk of blinding someone is unacceptably high.

92.     There are also potential health risks to veterans and others who might hear ground teams communicating with jets or jets flying overhead and be psychologically injured. The Supreme Court has held that such psychological impacts are cognizable under NEPA and must be considered. However, the Final EA failed to address these concerns.

*Impacts on Birds, Wildlife, and Animals*

93.     The Air Force also failed to adequately analyze the potential impact of noise on birds, wildlife, and domestic animals.

94.     Southern Idaho, and the Boise area in particular, are home to many species of birds and wildlife that are sensitive to human-caused impacts to their normal behaviors, including nesting/sleeping, feeding, breeding, and migration. Indeed, the Intermountain Bird Observatory, maintained by Boise State University, is located at the top of Lucky Peak and studies migrating raptors and other birds that use the region around Boise as a migratory fly-way.

95.     In addition, imperiled wildlife populations—such as bighorn sheep and greater sage-grouse—are found in many parts of southern Idaho within the scope of the Urban CAS Training Project.

96.     Rather than carefully analyzing the potential impact on these bird and wildlife populations, the Final EA summarily asserted—without any supporting evidence or analysis— that Urban CAS training will have little to no lasting harmful effect on birds or wildlife. This assertion lacks factual and scientific integrity and fails the NEPA hard look requirement. Moreover, this conclusory statement is insufficient in light of studies showing that aircraft noise may impact species of domestic and wild mammals and birds.

97.     In the absence of definitive data on the effect of noise on animals, the U.S. National Research Council has proposed that noise levels which negatively affect humans will

COMPLAINT – 22

also affect animals. The Air Force should have followed this guidance unless it is contraindicated for specific animals by the best available science. However, the decibel data that the Air Force provided is A-weighted, meaning that it's curved to approximate human hearing. The use of A-weighted decibels is inappropriate for animals, so unweighted decibel levels must be provided to even begin to allow analysis of the project's effects on animals.

98.     The Air Force also dismissed the possibility of bird strikes by asserting that bird strikes rarely occur over 3500 feet elevation—but rare does not mean they never happen. The Final EA further asserted that "[n]o additional effects on migratory birds would be expected because the overall number of air operations would remain the same, only distributed among the installation, [the Mountain Home Range Complex], and the nine urban centers. . . . Additionally, continuing adherence to existing Bird/Wildlife Aircraft Strike Hazard (BASH) protocols would limit the potential adverse effects." This claim ignores the fact that migratory bird flight patterns may differ across urban centers and that a change in the location of air operations may indeed increase the potential impacts to migratory birds.

99.     The Air Force's failure to closely study migrating raptors and other birds using the Boise-area flyway is of particular concern, as the Air Force aircraft operating in and around the Boise urban area may pose higher risks of collisions with birds that the Air Force has not evaluated.

100.     Additionally, the Final EA claimed that the Air Force will ensure air crews avoid wildlife conservation and refuge areas, but it provided no details as to how this will be accomplished. In Boise, Grand View, Bruneau, Hammet, Mountain Home, and Mountain Home Air Force Base, for instance, the 30 NM training circle overlaps the Morley Nelson Snake River Birds of Prey NCA, but the Final EA did not address what aircraft will do to avoid it. Moreover,

the Final EA did not discuss how such avoidance will protect birds that migrate beyond the arbitrary boundaries of these wildlife areas.

101.    Finally, even though the 30 NM areas over cities such as Grand View, Bruneau, Glenns Ferry, and Hammett, appears to overlap the Bruneau-Jarbidge Rivers Wilderness, Big Jacks Creek Wilderness, Little Jacks Creek Wilderness, and the King Hill Creek Wilderness Study Area, the Final EA fails to discuss avoiding these areas at all.

102.    The Final EA also failed to indicate whether or how the Republic of Singapore Air Force would be held to the BASH protocols or other wildlife protections laws applicable to federal agencies.

*Environmental Impacts of Fuel Dumping*

103.    The Final EA stated that fuel dumping by military aircraft might be necessary in an emergency, but it will only occur over unpopulated areas. Yet many of the unpopulated areas in the proposed range are used for recreation or wildlife protection. Nonetheless, the Air Force failed to assess and disclose the health and environmental impacts of dumping fuel in these sensitive areas.

**Reasonable Alternatives Proposed by Comments but Ignored**

104.    The Air Force further failed to meet its NEPA obligation to analyze reasonable alternatives to the proposed action that still fulfill the proposal's purpose.

105.    In both the Draft EA and Final EA, the Air Force addressed only the preferred plan and a "no action" alternative. A token effort was made at carrying other alternatives forward for analysis, but instead of true alternative plans, this was only a method of determining which cities were best able to meet the needs of the project. The alternatives failed to offer any difference in environmental impacts. Two additional alternatives—training over all nearby cities

COMPLAINT – 24

and training at other Air Force bases or military operating areas—were also summarily dismissed for failing to meet the purpose and need. No alternative considered ways to mitigate or minimize the adverse impacts of the training operations.

106.    Commenters raised at least two reasonable alternatives that the Air Force failed to fully consider. The first reasonable alternative was to have the Air Force develop its own urban range as a substitute for training among the civilian population. The Air Force immediately dismissed this alternative for failing to meet the purpose and need, arguing that it would require limiting current weapons employment training on gunnery ranges. However, a true examination of the proposal's reasonability would require further analysis of the degree of impact it would have on the gunnery range and a further investigation of the actual effects it would have on training, which the Air Force neglected to perform.

107.    The second reasonable alternative is the possibility that all Urban CAS Project training could be done in a simulator. Nellis Air Force Base in Nevada has a simulation facility that is described as "a most realistic training environment." It allows ground teams and pilots to work together inside the simulator to perform a range of missions under many conditions and adequately meets the needs and purpose of this proposal.

108.    Furthermore, a simulation could provide a superior range of urban and airspace environments to practice in because adverse weather conditions, enemy fire, and a whole range of other options could be simulated that would be too dangerous and unpredictable to practice live. This is not a remote or speculative option. Simulations are used widely by the US Air Force, Navy, Marines, Air National Guard, and other armed forces around the globe to practice coordinating land and air forces. *See* MetaVR, *Mission Training: JTAC Simulation*, http://www.metavr.com/casestudies/jtac.html. The technology is ready and able to substitute for

putting civilian populations in any degree of risk, so the Air Force had to explain why it failed to even consider this alternative, but did not do so in the Final EA.

109.    The Final EA also should have considered a combined alternative which minimized flights over civilian air space, and, instead, used simulations and/or improving the MHRC range to both minimize the potential risks to civilians and still allow a small number of live flights if they provide an irreproducible training atmosphere.

110.    Moreover, the Air Force summarily rejected another alternative involving training at other Air Force Bases (AFBs), arguing that suitable urban environments were unavailable at nearby bases, but this answer lacked reasonable examination and analysis. The final alternative proposal to build an urban CAS range on Air Force land is a real and viable alternative, and the Air Force should have analyzed whether other AFBs have enough land available to build a large urban CAS range without impacting their gunnery ranges or if Mountain Home AFB could share a different AFBs gunnery range while converting part of their own into a better urban CAS range. The Air Force failed to consider these viable alternatives, however.

<u>**FIRST CLAIM FOR RELIEF:**</u>

**NEPA and APA Violations: Failure to Prepare an EIS**

111.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

112.    This First Claim for Relief challenges the Air Force's violations of NEPA and NEPA's implementing regulations by authorizing Urban CAS Training Project without preparing an Environmental Impact Statement. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

113.    As discussed above, NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C). Under NEPA's implementing regulations, "significance" requires an evaluation of both the "context" of the action and its "intensity." 40 C.F.R. § 1508.27(a)–(b).

114.    Numerous factors, as identified above and in Plaintiffs' and other public comments, underscore that the Urban CAS Training Project may have significant impacts requiring the preparation of an EIS. These include, but are not limited to, the following:

A.    The high degree of controversy over the effect of the Urban CAS Training Project as evidenced by the substantial dispute about the size, nature, and effects of the action on humans and the environment, as well as the presence of comments which cast substantial doubt on the adequacy of the Air Force's methodology and data that were not resolved by the final EA;

B.    The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, because of the lack of modern standards or conclusive research on the impact of aircraft noise on humans and animals;

C.    The degree to which the action affects public health and safety; and

D.    The unique characteristics of the geographic area, which includes not only a third of the state of Idaho's population but also numerous state and federal conservation, wilderness, and refuge areas.

115.    Because the Air Force violated NEPA's requirements by approving the Urban CAS Training Project without preparing an EIS, its action is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF:

### NEPA and APA Violations: Failure to Take a "Hard Look"

116.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

117.    This Second Claim for Relief challenges the Air Force's violations of NEPA and implementing regulations in approving the Urban CAS Training Project based on the failure of the Final EA and FONSI to take a "hard look" at potential impacts as required by NEPA and failure to provide a convincing explanation of why no EIS was required. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

118.    As alleged hereinabove, and as will be presented in further briefing before the Court, the Final EA and FONSI are based upon unsupported assumptions, errors, and omissions, which renders them grossly deficient under NEPA and the APA.

119.    The Final EA and FONS failed to take a hard look at the potential impacts of the Urban CAS Training Project, including on human sleep, speech, and health; community annoyance; natural and rural soundscapes; environmental justice; and birds, wildlife, and animals.

120.    Accordingly, the Final EA and FONSI are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their board, staff, members and supporters, and must be reversed and remanded pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRD CLAIM FOR RELIEF:

### NEPA and APA Violation: Failure to Consider a Reasonable Range of Alternatives

121.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

122.    This Third Claim for Relief challenges the Air Force's violations of NEPA and implementing regulations in approving the Urban CAS Training Project without analyzing reasonable alternatives.

123.    As alleged hereinabove, and as will be presented in further briefing before the Court, the Air Force violated NEPA because the Final EA and FONSI refused to analyze reasonable alternatives to its proposed actions, including alternatives identified by public comments, or alternatives utilized elsewhere by the Air Force and other branches of the Armed Services.

124.    Accordingly, the Final EA and FONSI are arbitrary, capricious, an abuse of discretion, not in accordance with law under NEPA and the APA, and cause or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their board, staff, members and supporters, and must be reversed and remanded pursuant to the APA, 5 U.S.C. § 706.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **FOURTH CLAIM FOR RELIEF:**

### **NEPA and the APA Violation: Failure to Provide Adequate Notice and Public Participation**

125.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

126.    This Fourth Claim for Relief challenges the Air Force's approval of the Urban CAS Training Project as violating the public participation and notice requirements of NEPA and implementing regulations. This claim is brought under the judicial review provisions of the APA, 5 U.S.C. § 706.

127.    As alleged hereinabove, NEPA and implementing regulations require federal agencies to involve the public in preparing and considering environmental documents that implement the Act. *See, e.g.,* 40 C.F.R. §§ 1500.1(b), 1501.4(b), 1506.6.

128.     The Air Force violated its duties to inform the public of its proposed Urban CAS Training Project, to allow for meaningful and timely public involvement, and to respond to public comments in numerous respects as identified above and will be briefed before the Court.

129.     Accordingly, the Air Force's approval of Urban CAS Training Project through the Final EA and FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with law under NEPA and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their officers, members and staff, and must be reversed and remanded pursuant to the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.     Declare, order and adjudge that the Final EA and FONSI violate NEPA and the APA under any or all of the Claims for Relief above;

B.     Reverse, vacate, and set aside the Final EA and FONSI for violating NEPA and the APA;

C.     Remand the matter to the Air Force with instructions to prepare a NEPA-complaint EIS before undertaking any further training activities under the Urban CAS Training Project;

D.     Enter such preliminary and/or permanent injunctive relief as Plaintiffs may pray for hereafter;

E.     Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses, under the Equal Access to Justice Act, and/or any other applicable provision of law; and/or

      F.      Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs and the public.

DATED:  April 1, 2019          Respectfully submitted,

                                      Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

*Attorneys for Plaintiffs*

COMPLAINT – 31