Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@advocateswest.org
Sarah K. Stellberg (ISB # 10538)
sstellberg@advocateswest.org
Garrison Todd (ISB # 10870)
gtodd@advocateswest.org
Advocates for the West
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANNE HAUSRATH, JOHN WHEATON, JOANIE FAUCI, MEG FEREDAY, ROGER ROSENTRETER, KATHRYN RAILSBACK, DALE REYNOLDS, and GREAT OLD BROADS FOR WILDERNESS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE AIR FORCE, <br><br> Defendant. | Case No. 1:19-CV-00103-CWD <br><br> **OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION………………………………………………………………………..1

STATEMENT OF FACTS………………………………………………………………2

LEGAL STANDARDS…………………………………………………………………..6

     I.    APA STANDARD OF REVIEW………………………………………………..6

     II.   NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)……………………..6

PLAINTIFFS' ARTICLE III STANDING……………………………………………….8

ARGUMENT……………………………………………………………………………..9

     I.    THE AIR FORCE'S REFUSAL TO PREPARE AN EIS VIOLATES NEPA……………………………………………………………………………..9

          A.  Controversy Over the Effects of the Project Required an EIS………………..9

          B.  The Uncertain Effects of the Project Required an EIS………………………12

          C.  The Precedential Nature of the Project Required an EIS……………………13

     II.   THE AIR FORCE VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE IMPACTS OF AIRCRAFT NOISE…………………………14

          A.  Failure to Establish an Adequate Noise Baseline……………………………15

          B.  Failure to Take a Hard Look at Noise Impacts………………………………17
               1.  *Sleep Disturbance from Aircraft Noise*………………………………17
               2.  *Sleep Interference from Aircraft Noise*………………………………18
               3.  *Impacts to Natural Soundscapes and Quiet Recreation*…………………19
               4.  *Impacts to Birds and Wildlife*...............................................................20
               5.  *Environmental Justice Impacts*………………………………………21

          C.  Failure to Take A Hard Look At Cumulative Impacts from Air Force Overflights in Southern Idaho……………………………………………….22

     III.  THE AIR FORCE VIOLATED NEPA BY NOT ANALYZING A REASONABLE RANGE OF ALTERNATIVES………………………………23

CONCLUSION…………………………………………………………………………..25

**<u>INTRODUCTION</u>**

The United States Air Force began conducting urban warfare training exercises using F-15 jets and ground personnel from the Mountain Home Air Force Base (MHAFB) several years ago, without public notice or analysis under the National Environmental Policy Act (NEPA). After citizen complaints about noise impacts over the Boise area, the Air Force was informed by legal staff in 2014 that it needed to comply with NEPA, yet it waited until 2017 to initiate a cursory NEPA process—resulting in the November 2018 Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the "Urban Close Air Support Air and Ground Training Project" (Urban CAS Project, or Project) challenged here.

Under the EA and FONSI, the Air Force approved American and Singaporean F-15 fighter squadrons to conduct permanent urban military training exercises over Boise and other cities across southern Idaho. The Project entails repeated military jet overflights targeting on-the-ground troops within the cities, occurring day and night for up to 160 days per year. Hundreds of thousands of residents in Boise and across southern Idaho would be exposed in their homes, work places, and popular recreation areas to disruptive jet noise with the potential to interrupt sleep, interfere with work and school, and otherwise harm their quality of life. And the training will occur over popular public lands and wildlife habitats, such as the Boise Foothills, Boise River, and Snake River. This is the first time the Air Force has prepared NEPA analysis of urban warfare exercises and other Air Force bases are closely watching the Idaho example.

Despite the controversial and unprecedented nature of the urban training activities, the Air Force approved the Project without preparing a full Environmental Impact Statement (EIS) as required by NEPA. Moreover, as explained below, the EA and FONSI downplayed or ignored

noise impacts to humans and to birds and wildlife, and refused to consider any reasonable alternatives to their predetermined outcome.

Because the Air Force thus violated NEPA in multiple ways in approving the Project based on the inadequate EA and FONSI, the Court should grant summary judgment for Plaintiffs, and reverse and remand with instructions to prepare a fully NEPA-compliant EIS.

## STATEMENT OF FACTS

### The Air Force's Urban CAS Project

As approved by the EA and FONSI, the Urban CAS Project establishes a permanent urban warfare training program by American F-15E and Singaporean F-15SG fighter jets and flight teams operating out of MHAFB, conducting overflights over and targeting ground personnel within cities and towns across southern Idaho, including the greater Boise metropolitan area as well as Twin Falls, Burley, Glenns Ferry, Bruneau, Grandview, Mountain Home, and others. *See* Plaintiffs' Separate Statement of Material Facts (SOF) ¶¶ 1–5.[1]

The Project authorizes 160 "training events" per year by the F-15 jets, each entailing a set of "training operations" that would take place day or night within a single urban area in a 24-hour period, up to 400 training operations per year. *Id.* During a training operation, two or four aircraft leave MHAFB and first enter the "CAS wheel," then enter the urban airspace to conduct training (for a duration of 60 to 90 minutes), then return to MHAFB. *Id.* The "CAS wheel" is a

---

[1] In addition to the facts from the Administrative Record (AR) cited in the SOF, Plaintiffs submit herewith the Declaration of Dr. Jesse R. Barber, a Boise State University noise expert, who explains how the EA/FONSI failed to address science on potential noise impacts to birds and wildlife. The Court may properly consider Dr. Barber's declaration to demonstrate potential adverse impacts that the Air Force failed to adequately consider under NEPA. *See Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1162 (9th Cir. 2006); *Nat'l Audubon Soc. v. U.S. Forest Service*, 46 F.3d 1437, 1447 (9th Cir. 1993).

circular flight path on the outskirts of the urban center, of up to a 15 nautical mile (NM) radius, used by aircraft when not actively engaged in a training. *Id.*

Once the jets are in their holding patterns, a convoy of up to five vehicles and twenty soldiers will enter the urban center and act as the "Opposing Forces," while a convoy of up to five vehicles and fifteen soldiers would act as the "Friendly Forces" in charge of identifying the opposing forces for the military aircraft. *Id*. These convoys drive in unmarked cars, travel through and park in public spaces, and are disguised as plainclothes civilians. *Id.*

To begin a mission scenario, the Friendly Forces will communicate by radio with the F-15 jets above for help locating the Opposing Forces, which the aircraft will then track and target with training lasers. *Id.* During a training operation, the F-15 aircraft will fly over the urban center at 10,000 to 18,000 feet above ground for a duration of 60 to 90 minutes, then return to MHAFB. *Id.* Each training operation will be followed by a two- to three-hour break before another mission, resulting in an estimated maximum of six hours of flight over an urban center per day. *Id.*

The aircraft holding patterns would be directly over major population centers in the Boise metropolitan region, popular recreation areas including the Boise Foothills, and the Snake, Boise, and other rivers. SOF ¶ 6. These areas include riparian habitats and public lands having many bird and wildlife species of concern, including eagles and hawks, greater sage-grouse, bats, and many others. SOF ¶ 7.

### History of the Urban CAS Project

The Administrative Record reveals that MHAFB began conducting similar urban CAS training exercises over Boise and elsewhere in southern Idaho in at least 2010, without any public disclosure or even notifying local governments. SOF ¶¶ 11–12. During that training, the

Air Force split the airspace over Boise into a "holding side" and an "employment side" to reduce noise impacts. SOF ¶ 12. Even with this protection in place, citizens complained about the noise of this illegal training. *Id.*

Former Boise Mayor Bieter was unaware of the urban CAS training activities until at least 2014, and responded to a citizen's noise complaints in March 2014 that no military training was occurring in Boise. SOF ¶ 13. The complaints and inquiry from Mayor Bieter triggered an Air Force legal analysis in 2014, which advised that NEPA compliance was required before continuing such training. SOF ¶ 14. But Mountain Home AFB officials resisted this advice and protested having to conduct NEPA. *Id.*

Moreover, the Air Force released NEPA analyses for other MHAFB overflight and training activities during this period, including a 2013 EIS for potential beddown of F-35 fighter jets at MHAFB, a 2015 EA for temporary relocation of the 366th fighter wing to Boise's Gowen Field during reconstruction at MHAFB, and a 2017 EA for operational changes in the MHAFB training complex. SOF ¶¶ 9–10. Yet none of these NEPA documents disclosed that the Air Force was planning to conduct—nor that it was conducting—urban CAS training over Boise. *Id.*

By mid-2017, the Air Force had begun preparing for NEPA analysis of the Urban CAS Project. SOF ¶¶ 15–17. In August 2017, the Air Force determined that the Project EA would only address two alternatives, *i.e.*, its preferred action and "no action." *Id.* In October 2017, its preliminary analysis found "communities could expect substantial changes in the level of noise in their ambient environments" which "would mean pretty big community push-back, and "additional data would be needed to either clarify and refine the analysis" or identify another alternative. *Id.* But in November 2017, citing its self-imposed deadline to complete the NEPA by October 2018, the Air Force "approved streamlining the analysis" to omit discussion of

numerous issues, including "impacts on water resources, wetlands, and biological resources," *i.e.*, birds and wildlife. *Id.* The Air Force also decided on a "final list" of the nine cities for the Project by November 20, 2017, before the NEPA process was even announced. SOF ¶¶ 18.

As the record confirms, no NEPA analysis has been conducted for Air Force urban CAS training anywhere before. SOF ¶ 8. Since fall 2017, the Urban CAS EA process has thus been closely monitored by other Air Force bases to use as a "template document" for their own potential analyses of urban CAS training. SOF ¶ 19.

**The NEPA Process**

The Air Force finally announced the Urban CAS Project in February 2018, and conducted a thirty-day public scoping period. SOF ¶ 20. Scoping meetings in Boise were attended by many of the Plaintiffs, who provided scoping comments. *Id.*

On September 14, 2018, the Air Force issued a Draft EA and announced a thirty-day public comment period. SOF ¶ 21. The Draft EA considered only the Proposed Action involving the nine Idaho cities previously determined for the Project—which the Draft EA identified as the "Preferred Alternative"—and a "No Action" alternative. *Id.*

Plaintiffs timely submitted extensive comments on the Draft EA. SOF ¶ 22. Plaintiffs' comments detailed numerous ways that the Draft EA failed to take a hard look at the potential impacts of the proposal, including its inadequate noise analysis of impacts on humans and the need to fully address potential impacts on quiet recreation, and birds and wildlife, and suggested numerous alternatives to the proposed action. *Id.*

Yet as detailed below, the final EA and FONSI refused to analyze any reasonable alternatives in approving the Air Force's pre-determined outcome, while downplaying or

avoiding noise impacts on residents in the urban areas, and summarily dismissing any impacts to birds and wildlife, thus violating NEPA for reasons explained below.

## LEGAL STANDARDS

### I.   APA STANDARD OF REVIEW

Judicial review under the APA requires the Court to hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). A decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court need not defer to an agency's conclusions that are not supported by the record or run counter to the evidence before it. *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011) (*citing Earth Island Institute v. Hogarth*, 494 F.3d 757, 763–64 (9th Cir. 2007)); *Sierra Club v. E.P.A.*, 346 F.3d 955, 961 (9th Cir. 2003).

### II.   NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA is intended "to protect the environment by requiring federal agencies to carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." 40 C.F.R. § 1500.1(a); *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

NEPA thus requires "coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Churchhill Cty v. Norton*, 276 F.3d 1060, 1072–73 (9th Cir. 2001) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998)). It "guarantees that the relevant information will be made available to the larger [public] audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

To comply with NEPA, federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality (CEQ) has promulgated regulations implementing NEPA, which are binding on all federal agencies, including the Air Force. 40 C.F.R. §§ 1500 *et seq.* The CEQ regulations direct that an EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

An agency may elect to prepare an EA "[a]s a preliminary step . . . to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains*, 161 F.3d at 1212 (citing 40 C.F.R. § 1508.9(a)). The EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). If the EA indicates that "substantial questions are raised" as to whether a proposed action may have a significant effect, then the agency must prepare an EIS. *Blue Mountains*, 161 F.3d at 1212.

If an agency determines an EIS is not required, it must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a FONSI. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); 40 C.F.R. §§ 1501.4, 1508.9, 1508.13. A decision not to prepare an EIS is invalid if the analysis is not "based on a consideration of the relevant factors," or it "fails to supply a convincing statement of reasons why potential effects are insignificant." *Metcalf*, 214 F.3d at 1141–43.

## PLAINTIFFS' ARTICLE III STANDING

Plaintiffs include the national conservation organization, Great Old Broads for Wilderness, and a collection of concerned Boise residents who live, work, recreate, and otherwise use and enjoy the areas—including their private properties and public lands—that will be impacted by the Urban CAS Project. *See* Declarations of Pamela G. Conley, Joanie Fauci, Meg Fereday, Anne S. Hausrath, Kathryn Railsback, Dale Reynolds, Roger Rosentreter, and John Wheaton, submitted herewith. They have experienced adverse impacts from the Air Force's existing training exercises over Boise and are deeply concerned by the Air Force's failure to candidly and accurately disclose the Project's potential impacts on their use and enjoyment of their private property, public spaces and public lands, and birds and wildlife they cherish. *Id.* They face irreparable injury as a result of the Air Force's NEPA violations, including from the risk that significant environmental impacts have been concealed or overlooked, causing unnecessary interference with their health, recreation, and quality of life. *Id.* Plaintiffs' injuries would be redressed by a favorable decision of this Court setting aside the EA/FONSI and ordering an EIS. *Id.* Plaintiffs' declarations thus demonstrate that they meet the injury, causation, and redressibility requirements for Article III standing. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527 (9th Cir. 1997).

## ARGUMENT

The Air Force violated NEPA in three distinct ways: by refusing to prepare an EIS, by relying on an EA that failed to take a "hard look" at potential environmental impacts, and by failing to consider a reasonable range of alternatives to the Project. Any one of these NEPA violations is sufficient to vacate and remand the Air Force's EA/FONSI.

## I.     THE AIR FORCE'S REFUSAL TO PREPARE AN EIS VIOLATES NEPA.

NEPA requires a federal agency to prepare an EIS whenever a project "<u>may</u>" have significant environmental impacts. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (emphasis in original). "[T]his is a low standard." *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011).

In determining whether an action will "significantly" affect the environment, the CEQ regulations list factors that should be considered, which include: (1) "[t]he degree to which the effects . . . are likely to be highly controversial," (2) "[t]he degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks," and (3) "[t]he degree to which the action may establish a precedent for actions with significant effects or represents a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b). The presence of a single factor may be sufficient to require an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). As explained below, each of these "significance" criteria are triggered here, thus requiring an EIS.

### A.     Controversy Over the Effects of the Project Required an EIS.

An action is "highly controversial" when there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 736–37 (9th Cir. 2001),

*abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). Public comments that raise substantial questions about the agency's environmental analysis create sufficient controversy for which an EIS must be prepared. *Id.*

In *National Parks*, for example, the Ninth Circuit found an agency action to be highly controversial where public comments "urged that the EA's analysis was incomplete" and "cast substantial doubt on the adequacy of the [agency's] methodology and data," thus going beyond a mere public opposition to the project. *Id.* Similarly, the Ninth Circuit has explained that public controversy warranted an EIS where 90 percent of public comments opposed a project and provided "real criticism" of the agency's environmental analysis that went unaddressed. *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1027 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004); *see also LaFlamme v. FERC*, 852 F.2d 389, 401 (9th Cir. 1988) (agency action highly controversial due to critical comments on the environmental analysis); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1024–26 (S.D. Cal. 2003) (same).

This case is similar to *National Parks* and *Public Citizen*, in that Plaintiffs and numerous other concerned citizens submitted comments questioning the adequacy of the Air Force's EA. Of the 96 total comments listed in the EA, 87 percent opposed the Project and 63 percent provided substantive criticism on the Draft EA.[2] Public comments identified flaws in the Air Force's methodology for evaluating noise impacts, including sleep interference, speech interference, and community annoyance. *See* AR17372–80. Others disputed the Air Force's methodology for evaluating noise impacts and provided evidence of actual community annoyance from existing F-15 flyovers. *See, e.g.*, AR17899; AR17741; AR17382–83;

---

[2] These figures are based on the Air Force's "Comment Resolution Matrix," which appears to omit significant negative comments from Great Old Broads and others. AR00271–354.

AR17718–20; AR17714–16; AR17692–93; AR17695–97; AR17729–31; AR17735; AR17778–79; AR17690–91; *see also generally* AR17899–17929. Other comments challenged as unsupported the Air Force's assertion that birds and wildlife would not be impacted, requesting an analysis of potential disruption to migratory birds and sensitive nocturnal species such as bats and owls. *See, e.g.*, AR17374; AR17715; AR17696. These public comments cast serious doubt upon the reasonableness of the EA's methods and conclusions.

Rather than responding to this extensive negative feedback, the Air Force simply directed commenters to sections of its EA. *See* AR17899–17929. Nowhere did the Air Force directly explain, much less "convincingly" explain, why the comments do not suffice to constitute a public controversy. *See LaFlamme*, 852 F.2d at 401. This substantial, unaddressed criticism regarding the agency's environmental analysis renders the action "controversial" and "require[d] preparation of an EIS." *Public Citizen,* 316 F.3d at 1027.

The record also reveals internal disagreement about the significance of noise impacts. As noted above, the Air Force's preliminary analysis in October 2017 concluded that Urban CAS operations would be clearly audible and that communities "could expect substantial changes in the level of noise," that "would be especially concerning in the small, rural communities," and would cause "pretty big community push-back." AR20437. Yet in stark contrast, the EA asserted that the sound of military jets will "blend naturally with the existing soundscapes." AR00052. The record reveals no explanation for this change in opinion—other than the directive in November 2017 to "streamline" the analysis and drop numerous issues, *see* SOF ¶ 17— and reinforces the significant controversy over the Project's impacts that required an EIS.

In sum, the significant internal and external controversy over the "size, nature, or effect" of the Urban CAS Project demonstrate that an EIS is required. *National Parks*, 241 F.3d at 736.

B.      **The Uncertain Effects of the Project Required an EIS.**

An agency must also prepare an EIS if the environmental effects of a proposed agency

action are "highly uncertain." *Id.* at 731. "Preparation of an EIS is mandated where uncertainty

may be resolved by further collection of data, . . . or where the collection of such data may

prevent speculation on potential effects." *Id.* at 732 (citation and internal quotation omitted).

Courts typically find this significance factor implicated where an action is new or

experimental, *see, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (first-ever whale

hunt); *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 153 (D.C. Cir. 1985) (first-ever release

of genetically engineered organisms); *Oregon Wild v. Bureau of Land Mgmt.*, No. 6:14-cv-0110,

2015 WL 1190131, *8–*9 (D. Ore. Mar. 14, 2015) (ecological restoration pilot project), or

where deficiencies in existing data or science otherwise render the environmental effects of an

action uncertain, *see, e.g.*, *National Parks*, 241 F.3d at 732.

This case implicates both factors. The Project proposes to implement an unprecedented

military training program centered over civilian cities. Air Force officials conceded that this EA

is the first NEPA document to address the impacts of Urban CAS operations. *See* AR13976.

Moreover, there are significant gaps in the Air Force's understanding of the Project's effects.

One key source of uncertainty is the absence of baseline noise data. Rather than measure

ambient noise levels in the affected communities, the Air Force relied on a rough estimate of

background noise (DNL) based on city size: large, 57 dBA[3]; medium, 52 dBA; and small, 40

_____

[3] As the EA explained, sound intensity is measured in decibels (dB), which is a logarithmic unit,
and "dBa" means the "A-weighted decibels," used to approximate perception of sound by
humans. *See* AR00048–49. The EA used "Sound Exposure Level" (SEL), "the level of a 1-
second long constant sound," to assess single overflight noise levels; and "day-night sound level"
(DNL), "the average sound energy in a 24-hour period with a 10 dB penalty added to the
nighttime levels," to assess noise impacts on sleep and speech disturbance. *See* AR00048–54.

dBA. AR00049–50. Among other flaws, this method failed to consider that noise levels widely within each 15 NM-radius training area, which include both the target city and quieter outlying residential and natural areas. *See* SOF ¶¶ 37-39 (describing flaws with noise baseline). An accurate measure of baseline noise was necessary to provide a basis against which noise-related impacts could be analyzed, as the Air Force itself recognized in the F-35 Beddown EIS. *See* AR01111–14. The absence of such data means that aircraft noise from the Project may be far more audible, annoying, and intrusive than examined in the EA. As the Ninth Circuit held in *National Park*s, preparation of an EIS is mandated where, as here, uncertainty regarding noise impacts "may be resolved by further collection of" such baseline noise data. *Id.*

The EA's cursory dismissal of bird and wildlife impacts also raises substantial questions about the Project's effects. The EA summarily asserted that, regarding birds and wildlife, noise levels "would not be of sufficient magnitude to result in direct loss of individuals or reduce reproductive output." AR00047. The EA referenced no studies or research articles in dismissing any impacts to birds or wildlife. *Id.* As explained by BSU noise expert Dr. Barber, the Air Force had no excuse for failing to consider any quantified or detailed information about the extent of potential bird and wildlife impacts, given the substantial literature documenting the effects of anthropogenic noise on wildlife. *See* Barber Decl. ¶¶ 15–22.

In the face of such uncertainty, especially given the magnitude and indefinite nature of the proposal, the Air Force must prepare an EIS.

### C.    The Precedential Nature of the Project Required an EIS.

The effects of the Project are also significant because the Air Force's decision "may establish a precedent" for similar urban warfare training at other locations. 40 C.F.R. § 1508.27(b)(6). The Administrative Record is filled with references to the precedential nature of

the Urban CAS Project. *See* SOF ¶ 19. Air Force staff admitted that high-level officials were

tracking the Project as a test case for urban CAS training operations elsewhere and that the

NEPA analysis would be used as a "template" for other installations, including the following:

- "That we are aware, this is the first NEPA document to cover/address Urban CAS operations with both air and ground support in civilian cities. . . . Kind of a big deal. USAF is watching this closely, and I am informed that other installations are already planning to use the EA we are writing as the template for analysis approach, level of detail, and response to community concerns." AR13976.

- "Urban CAS is a nut that SOCOM [Special Operations Command] and the Air Force have been trying to crack for a long time in a broader context. ACC [Air Combat Command] is looking to us to see if we can do it." AR22610.

- "The Urban CAS NEPA effort at Mountain Home is currently poised to be a template document for other installations who are already inquiring about how this effort is progressing." AR20342.

The unprecedented nature of the Urban CAS Project, and the high probability of its serving as a

precedent for installations elsewhere, thus required the Air Force to prepare an EIS.

In sum, the effects of the Urban CAS Project are highly uncertain, controversial, and will

set a precedent for similar urban training programs in other cities, all demonstrating that an EIS

was required. The Court should thus grant Plaintiffs summary judgment on this ground alone.

## II.    THE AIR FORCE VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE IMPACTS OF AIRCRAFT NOISE

Regardless of whether an EIS was required, the EA and FONSI must also be reversed for

violating NEPA's "hard look" requirement. Agencies preparing an EA must take a "hard look" at

the environmental consequences of the proposed action, *Kleppe v. Sierra Club*, 427 U.S. 390,

410 n.21 (1976), including direct, indirect, and cumulative effects. 40 C.F.R. §§ 1508.9(b),

1508.25(c). Taking a "hard look" requires "a reasonably thorough discussion of the significant

aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761

(9th Cir. 1982). The hard look doctrine bars "[g]eneral statements about 'possible effects' and

'some risk' . . . absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). The agency also must disclose if information is incomplete or unavailable, and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." 40 C.F.R. § 1502.22(b)(1).

Here, the information and analysis in the EA and FONSI were general, incomplete, and inaccurate, violating NEPA's "hard look" command in numerous respects.

### A.    Failure to Establish an Adequate Noise Baseline

The Air Force violated its "hard look" duty by failing to establish a realistic baseline of ambient noise levels in the affected communities. Under NEPA, an agency has a duty to assess, "in some reasonable way, the actual baseline conditions" of the affected resources. *Oregon Natural Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016) ("*ONDA*"). The assessment of baseline conditions "must be based on accurate information and defensible reasoning." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). "[W]ithout establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

As explained above, rather than take measurements or gather actual data to establish baseline noise levels for the impacted areas, the EA instead grouped the target cities into three size categories and estimated a single noise level for each size category. *See* AR00049–54 (citing ANSI 2013). This approach violated NEPA for several reasons.

First, the Air Force declined to provide any reasoned explanation for why actual ambient noise data was not collected. The Ninth Circuit mandates that an agency complete an EIS "where

uncertainty may be resolved by further collection of data, or where the collection of such data may prevent 'speculation on potential . . . effects.'" *National Parks*, 241 F.3d at 732 (citations omitted). Collection of actual ambient noise data here could have helped resolve key uncertainties about the noise impacts on Idaho communities—such as interference with sleep disturbance, communication, or quiet recreation—and on birds and wildlife. *See* Barber Decl. ¶ 11 ("There is no substitution for sound level measurements."). There is no record evidence that such data would be impractical or impossible to gather. Baseline noise conditions were particularly important here because noise impacts were by far the most significant concern during the NEPA process. Thus, the decision not to collect actual baseline noise data was unreasonable. *See, e.g.*, *Idaho Conservation League v. U.S. Forest Service*, No. 1:11-CV-00341-EJL, 2012 WL 3758161, at *16 (D. Idaho Aug. 29, 2012) (agency's decision not to gather data on local groundwater conditions before rendering FONSI was unreasonable); *Gifford Pinchot Task Force v. Perez*, No. 03:13-CV-00810-HZ, 2014 WL 3019165, at *31 (D. Or. July 3, 2014) (approval of exploratory drilling project without gathering any site-specific baseline data was arbitrary and capricious where agency provided no explanation for why no baseline study was performed).

Second, to estimate background noise levels, the EA relied on a formula which explicitly stated it "should not be used" to predict DNLs under 50 dB, such as the estimates the EA used for Grandview, Bruneau, Glenns Ferry, Hammett, and Mountain Home. SOF ¶¶ 36–38. The EA failed to explain why it relied on the study's inapplicable formula for these small cities.

Third, the Air Force unreasonably used the noise levels of each target city as a proxy for noise levels within each entire 15 NM-radius training operations area. The EA failed to acknowledge that the training areas cover wide swaths of unincorporated lands and natural

habitat surrounding each city, such as the Boise Foothills, with population densities far below those of the urban core. *See* SOF ¶ 6. For example, Glenns Ferry accounts for just 1.75 mi$^2$ of the total 936 mi$^2$ training circle centered on that city. *See* SOF ¶ 39. No effort was made to quantify baseline noise levels for natural environments surrounding each city, such as the Boise Foothills, which experience noise levels orders of magnitude below those presented in the EA for urban centers. *See* Barber Decl. ¶ 11.

Each of these flaws likely caused the Air Force to overestimate baseline noise levels, and therefore underestimate the noise impacts. The EA's analysis in this case is similar to those rejected in *Great Basin*, 844 F.3d at 1003, and *ONDA*, 840 F.3d at 570, where the agency's estimation of baseline conditions rested on inaccurate information or indefensible reasoning.

### B.   Failure to Take a Hard Look at Noise Impacts

#### 1.   *Sleep Disturbance from Aircraft Noise*

The Air Force failed to take a hard look at potential sleep interference impacts from the Urban CAS Project. The EA relied on a static Sound Exposure Level (SEL) threshold to gauge the impact of overflights on human sleep. SOF ¶¶ 28–29. SEL is the total amount of sonic energy caused by a single noise event, expressed as the A-weighted decibel (dBA). *Id.* The EA stated that the threshold for human sleep interference is an SEL of 90 dBA and predicted that the SEL of the Urban CAS Project will not exceed 72.3 dBA—thus concluding that the overflights "would not . . . awaken individuals from sleep." AR00051; SOF ¶ 30. There are several key flaws with this analysis of sleep impacts.

First, the EA did not disclose that its sleep interference threshold of 90 dBA presumed a 25 dB noise reduction attributable to a building envelope, and therefore assessed only the probability of awakening individuals who are sleeping indoors with closed windows. SOF ¶¶ 30–

32. The EA failed to examine the risk of awakening those sleeping with their windows open, or impacts on persons sleeping outside or in tents, who would be subjected to sufficient noise to interfere with sleep. *Id.*

Second, the EA failed to acknowledge that its SEL of 90 dBA is the threshold for a single noise event to cause awakening. SOF ¶¶ 31–32. Yet the Department of Defense recognizes that repeated noise events—such as the multiple fly-overs in a single night proposed by the Urban CAS Project—are known to substantially increase the likelihood of awakening at any given decibel level. *Id.* The EA failed to provide any data on the number of times aircraft would fly over a given location during any given night of trainings, or to analyze the impacts of repeated flyovers. *Id.* The EA thus failed to analyze how a full night of flyovers—as opposed to a single flyover—would impact sleep.

Third, the EA only addressed the potential of overflights fully waking civilians, but not other impacts of nighttime noise, such as impaired or delayed sleep, which can have serious health and economic impacts. SOF ¶ 32. In another recent NEPA analysis at Mountain Home AFB, the Air Force acknowledged that noises insufficient to cause awakenings can nonetheless interrupt sleep cycles. AR01626. The EA thus arbitrarily failed to address these other sleep-related impacts, despite public comments noting this deficiency. AR17376.

        2.    *Speech Interference from Aircraft Noise*

The Air Force also failed to take a hard look at potential speech interference impacts from aircraft noise. The EA used the Maximum Sound Level ("$L_{max}$")—the max dBA at a single point in time—to determine the impact of individual flyovers on speech and communication. SOF ¶ 35. It estimated that the $L_{max}$ of individual flyovers will not exceed 59.3 dBA and asserted that aircraft noise under 75 dBA $L_{max}$ will not interfere with communication. *Id.*

Similar to sleep impacts, the EA's analysis was flawed and incomplete because the 75 dBA standard for speech interference assumed 25 dBA of protection from being indoors. SOF ¶ 36. But outdoor speech interference can occur at just 50 dBA $L_{max}$, a level well below the stated 59.3 dBA $L_{max}$ for the Project. *Id.* This means the EA failed to address how the overflights could impact, for example, Boise residents enjoying conversation over coffee or dinner at outdoor restaurants, or interfere with the communications of outdoor workers, hikers and runners, students on field trips, and so forth.

### 3.    *Impacts to Natural Soundscapes and Quiet Recreation*

The EA further failed to address impacts to natural soundscapes and quiet recreation within and around the selected urban centers. SOF ¶¶ 37–42. The EA projected that the average noise level for the Urban CAS Project will never exceed 37 dBA DNL and will thus "blend naturally with the existing soundscapes in these areas." *Id.* Yet the EA failed to account for potential impacts to natural, recreational, and wildlife areas in and around the urban targets which have far lower background noise levels than the Air Force acknowledged. *Id.*

Boise and other impacted urban centers include large swaths of public lands and foothill trails whose naturally quiet soundscapes are highly valued. *See* SOF ¶¶ 6; Plaintiffs' Declarations. These areas lack the elevated background noise levels associated with commerce, traffic, and other trappings of urban life. Visitors to these areas expect to be able to escape the sights and sounds of modern life, and the roar of F-15s passing overhead will impair their enjoyment of these natural resources. *Id.* Even using the Air Force's inflated background noise estimates, the aircraft noise from the Urban CAS Project will be clearly audible. The Air Force estimated that aircraft flyovers for the Project will produce an $L_{max}$ of up to 59.3 dBA. That is an

order of magnitude louder than the background noise in natural areas and will not fade into the background for people recreating in these areas.

The Air Force itself has previously recognized the potential for its overflights to adversely affect natural soundscapes and outdoor recreation, further undermining its disregard of these impacts here. For example, the Air Force's F-35 Beddown EIS acknowledged that in "rural and wildlife areas, analysis of effects is vastly different compared to areas near population centers," that overflights "could be perceived as incompatible with. . . recreation and wilderness aesthetics," and that public concerns include "effects to wildlife . . . natural soundscapes and outdoor recreation." AR01129. Additionally, an internal memo reveals that as the Air Force began selecting cities for the Urban CAS Project, certain locations were not "carried forward due to noise impact on the recreational area." AR20322. By then omitting consideration of potential noise impacts on natural soundscapes and quiet recreation in the EA, the Air Force again acted arbitrarily and failed NEPA's hard look requirement.

### 4.   *Impacts to Birds and Wildlife*

The EA also failed to take a hard look at potential impact of noise on birds and wildlife. Southern Idaho, including the Boise River and Snake River Plain, which provide important habitat and migratory pathways for birds and wildlife. SOF ¶¶ 6-7.

Rather than analyzing potential impacts to birds and wildlife, the EA simply asserted, with no supporting evidence or analysis, that the Project noise levels "would that not be of sufficient magnitude to result in direct loss of individuals or reduce reproductive output." AR00047. This followed the November 2017 instruction to "streamline" the EA analysis by omitting consideration of bird and wildlife impacts. SOF ¶ 17. This type of "conclusory statement[], without any supporting data, do[es] not constitute a 'hard look' at the environmental

consequences of the action as required by NEPA." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 974 (9th Cir. 2006).

Moreover, the Air Force ignored a substantial body of literature demonstrating that many species of birds and wildlife are sensitive to anthropogenic noise. SOF ¶ 44. BSU noise expert Dr. Barber details a number of those studies, which include noise impacts on greater sage-grouse—a species of particular concern in southern Idaho. Barber Decl. ¶¶ 10–24. As explained by Dr. Barber, "noise is a critical variable to consider in any environmental assessment of potential impacts to birds and wildlife, and the broader ecological systems in which they are found. In summarily dismissing any such impacts, without analysis or consideration of relevant science, the Air Force EA again is not scientifically supportable, in my opinion." *Id.* ¶ 22.

5.   *Environmental Justice Impacts*

The Air Force also failed to take a hard look at the Project's impact on environmental justice. Executive Order 12,898 requires federal agencies to determine whether a project will have a disproportionately adverse effect on minority and low-income populations. *See* Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 16, 1994); *see also* 32 C.F.R. § 989.33 (Air Force regulation codifying Executive Order 12,898).

To accomplish this, an agency must determine whether the impacted area contains a disproportionately high percentage of low-income or minority residents, as compared to an appropriate unit of comparison (e.g., the entire state). The agency must also consider whether low-income and minority residents are otherwise more susceptible to the adverse impacts than the general population. *See* CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 26 (1997). Here, the EA summarily asserted that the Project will not

disproportionately impact minority and low-income populations, because the training areas are comprised of less than 50% low-income and minority residents and that every population within the training areas "would be equally as likely to experience effects." AR00048. There are two key flaws with this analysis.

First, the EA failed to consider whether the proportion of low-income and minority residents in the target cities—even if less than 50%—is nonetheless "disproportionately higher" than other communities of comparison. SOF ¶¶ 32–34.

Second, the EA failed to consider that low-income and minority residents may be more susceptible to adverse noise impacts than the general population. *Id.* Differences in housing characteristics may cause greater indoor noise impacts on low-income communities. For example, less insulation, single-paned windows, poor-quality construction, or open windows in the summer due to lack of air conditioning may increase exposure to aircraft noise. The EA also disregarded the disproportionate impact of this Project on the vulnerable homeless population. In failing to address potential impacts on the homeless or other low-income or minority residents, the EA thus violated NEPA and the Air Force's own regulations requiring such analysis, again warranting reversal.

### C.     Failure to Take a Hard Look at Cumulative Impacts from Air Force Overflights in Southern Idaho

NEPA requires adequate disclosure of the cumulative impacts of the proposed action "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7. A cumulative impact analysis must separately describe related projects, their environmental effects, and "consider the[ir] interaction" with the proposed project. *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007).

The Air Force violated this requirement by failing to adequately address the cumulative

noise impacts of the Urban CAS Project, when added to other military overflights in southern

Idaho. Southern Idaho has already been subjected to a high level of military aircraft activity out

of MHAFB—approximately 60,559 operations per year. AR00015. While the EA listed certain

existing and proposed Air Force activities in the region—such as expanded airspace use in the

Owyhees and embedding of additional Singaporean F-15 aircraft—it provided no data or

analysis of their environmental effects. AR00087–93. The EA then concluded, without any

support, that any cumulative noise impacts on the urban centers would be "minor." AR00094.

This perfunctory analysis violates NEPA. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1379

("quantified or detailed information is required" to take a hard look at cumulative impacts);

*Great Basin Mine Watch*, 456 F.3d at 971–74 (requiring a "quantified assessment" and

"objective quantification of the impacts" from other projects).

## III.   THE AIR FORCE VIOLATED NEPA BY NOT ANALYZING A REASONABLE RANGE OF ALTERNATIVES.

The Air Force further failed to meet its NEPA obligation to analyze reasonable

alternatives to the proposed action. In both the Draft EA and Final EA, the Air Force addressed

only the preferred plan and a "no action" alternative. SOF ¶¶ 21, 23. The Air Force had already

determined in November 2017 the list of nine cities it would use for the Project. SOF ¶ 18. The

"no action" alternative was only included to provide a baseline, since the Air Force already

determined it would not meet the "purpose and need" for the Project. SOF ¶ 23.

The EA refused to consider reasonable alternatives proposed by commenters, which

included: (1) using simulators; (2) building an urban range at another MHAFB site that would

not disturb their gunnery range; (3) a combined alternative of simulations, range development,

and a small number of training flights, and (4) limiting the Project's duration to allow for

detailed future analysis of concrete data. SOF ¶¶ 24–28. Simulators are very sophisticated and are used widely by the Air Force to train for all facets of flight operations; and the Air Force has publicly stated that simulators are used around the world to provide training to ensure troops are "qualified" and "proficient" at close air support. SOF ¶ 28. Yet the Air Force refused even to consider using any simulator alternatives here, much less evaluate them fully in the EA.

Even more remarkably, the EA did not even consider an alternative of splitting the Boise airspace into "holding" and "employment" sides to minimize noise impacts, as did in conducting prior urban CAS training. SOF ¶ 26. Surely the practice that the Air Force itself previously used to reduce noise impacts on Boise residents should at least have been considered in the EA.

The alternatives considered in the EA thus failed to offer any difference in environmental impacts or consider ways to mitigate the adverse impacts of the training operations. Numerous courts have reversed similar NEPA analysis that reflect a pre-determined outcome without analysis of reasonable alternatives. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (NEPA violated where agency "considered only a no action alternative along with two virtually identical alternatives"); *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (rejecting as unreasonable a range of eight alternatives that all assumed the same level of roadless area development); *Nat. Res. Def. Council v. Evans*, 168 F. Supp. 2d 1149 (N.D. Cal. 2001) (considering status quo and preferred alternative not a reasonable range of alternatives).

The Air Force also violated its duty to "briefly discuss the reasons for" eliminating alternatives from detailed study. *See* 40 C.F.R. § 1502.14(a). The Air Force refused to acknowledge—much less examine—the alternatives proposed by commenters, which would have minimized the potential risks to civilians while still meeting the Air Force's stated training needs. The "existence of [these] viable but unexamined alternative[s]" renders the EA

inadequate. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1042, 1038 (9th Cir. 2008)

(quoting *Alaska Wilderness Recr. v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995)).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion

for Summary Judgment, enter summary judgment in their favor, and reverse and remand the

challenged Urban CAS Project EA and FONSI with instructions to prepare a fully NEPA-

compliant EIS.

Dated: January 15, 2020.               Respectfully submitted,

                                       */s/ Laird J. Lucas*
                                       Laurence ("Laird") J. Lucas (ISB # 4733)
                                       Sarah K. Stellberg (ISB # 10538)
                                       Garrison Todd (ISB # 10870)

                                       *Attorneys for Plaintiffs*