UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANNE HAUSRATH, JOHN WHEATON, JOANIE FAUCI, MEG FEREDAY, ROGER ROSENTRETTER, KATHRYN RAILSBACK, DALE REYNOLDS, and GREAT OLD BROADS FOR WILDERNESS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE AIR FORCE,<br><br>Defendant. | Case No. 1:19-CV-00103-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are cross motions for summary judgment in this environmental case, and Defendant's related motion to strike. The matters have been fully briefed and are ripe for the Court's consideration. The Court conducted a video hearing on August 27, 2020, and took the motions under advisement. For the reasons explained more fully below, the Court will deny Defendant's motion for summary judgment, grant Plaintiffs' motion for summary judgment, and deny Defendant's motion to strike.

## BACKGROUND

This case arises out of the United States Air Force's November 7, 2018 finding of no significant impact (FONSI) from its proposed program of Urban Close Air Support training missions originating from Mountain Home Air Force Base and operating in nine urban centers nearby, including the city of Boise. AR 00002.

Mountain Home Air Force Base had conducted Urban CAS training missions in southern Idaho and in the air space over Boise since at least 2010, without preparing a NEPA analysis. The USAF ceased conducting these training activities over Boise from 2015 until the issuance of the FONSI in November of 2018. *See* AR 21833–34; 20322; 20937 – 39; 20438; 00512.[1] Historical operations over Boise prior to 2015 involved the use of airspace south of the city as a holding area, where aircraft flew while waiting to be called into a particular training scenario directly over the urban center, as a measure for noise abatement. AR 20438.

The Urban CAS training operations described in the USAF's Environmental Assessment (EA) would expand the Urban CAS training program, and proposes to utilize the airspace over nine urban centers, including Boise. Urban CAS training operations would involve the use of two to four F-15E and F-15SG aircrews and plain-clothed ground support teams to simulate urban combat. AR 00012 – 20. During a training operation, two or four aircraft leave Mountain Home Air Force Base and first enter the "CAS wheel," then enter the urban airspace to conduct training (for a duration of 60 to 90

---

[1] It is not clear from the record whether the USAF currently conducts Urban CAS training utilizing the airspace over Boise.

minutes), then return to base. *Id*. The "CAS wheel" is a circular flight path on the outskirts of each urban center, of up to a 15 nautical mile (NM) radius, used by aircraft when not actively engaged in a training exercise. AR00025.

Aircraft fly over the urban center at an altitude of 10,000 to 18,000 feet (1.9 to 3.4 miles) above ground level for sixty to ninety minutes at a time. AR00022–25. The USAF proposes to execute a total of 160 Urban CAS training events (involving 400 training operations) conducted across nine identified urban centers annually during surges in preparation for deployment. AR 00022. Of these events, 120 would involve a maximum of three hours of flight over an urban center per day, while up to 40 annual training events would involve two day training and two night training operations within a 24-hour period, resulting in six hours of dedicated flight activities. AR 00022 – 23. Each training operation would be followed by a two- to three-hour break before another mission would begin. *Id.*

Generally, only two aircraft would be in the urban center airspace at one time. AR 00022. If the training event involved four aircraft, one pair of aircraft would remain on a circular flight path on the outskirts of the target area, or CAS wheel, until the pair of aircraft operating in the urban center exited the CAS wheel to execute an operational hand-off. AR 00022.

The USAF proposes to select large, medium, and small urban centers for the Urban CAS training program, intending to provide the varied characteristics necessary to simulate the range of built environments encountered during day and night combat missions. AR 00027 – 28. According to the USAF's selection standards, the following

urban centers were chosen for Urban CAS training: Boise, Mountain Home, Burley, Twin Falls, Grand View, Bruneau, Glenns Ferry, Hammett, and Mountain Home Air Force Base. AR 00027 – 37. The table below reflects the urban centers selected and the anticipated number of training days over these centers:

Table 2-5.   Annual Envelope of Training Events at each Urban Center

| Urban Area | Total Number of Training Events (Training Operations) [1,2] | | Number of Day Training Events (Training Operations) | | Number of Day-Night Training Events (Training Operations) | |
|---|---|---|---|---|---|---|
| | Projected Level | Surge Level | Projected Level | Surge Level | Projected Level | Surge Level |
| *Large Urban Centers* | | | | | | |
| Boise | 60 (160) | 160 (400) | 45 (100) | 120 (240) | 15 (60) | 40 (160) |
| *Medium Urban Centers* | | | | | | |
| Mountain Home | 25 (63) | 160 (400) | 19 (38) | 120 (240) | 7 (25) | 40 (160) |
| Burley | 13 (31) | 160 (400) | 10 (19) | 120 (240) | 3 (13) | 40 (160) |
| Twin Falls | 13 (31) | 160 (400) | 10 (19) | 120 (240) | 3 (13) | 40 (160) |
| *Small Urban Centers* | | | | | | |
| Grandview | 10 (13) | 160 (400) | 8 (15) | 120 (240) | 3 (10) | 40 (160) |
| Bruneau | 10 (13) | 160 (400) | 8 (15) | 120 (240) | 3 (10) | 40 (160) |
| Glenns Ferry | 10 (13) | 160 (400) | 8 (15) | 120 (240) | 3 (10) | 40 (160) |
| Hammett | 10 (13) | 160 (400) | 8 (15) | 120 (240) | 3 (10) | 40 (160) |
| Mountain Home AFB | 10 (13) | 160 (400) | 8 (15) | 120 (240) | 3 (10) | 40 (160) |

Table Notes:

1. Projected and surge levels of day, and day-night training events and training operations for an urban center were calculated using the proposed annual projected and surge levels of training events, respectively, for that urban center.

2. Numbers of operations calculated for urban centers were rounded to the nearest whole number if the distribution of operational totals resulted in a decimal number of 0.5 or greater.  Thus, totals may not sum to the projected level of operations presented in **Section 2.1.5**.

During planning and analysis in 2017, the USAF recognized noise was an issue. AR 20437. Section 3.1 of the EA sets forth the USAF's noise analysis. AR 00048 – 00054. Background noise levels addressing the Equivalent Sound Level ($L_{eq}$) and Day-

Night Sound Level (DNL)[2] were estimated for the urban centers and surrounding areas

using the techniques specified in the *American National Standard Institute - Quantities*

*and Procedures for Description and Measurement of Environmental Sound Part 3:*

*Short-term measurements with an observer present* (ANSI 2013). AR 00049 – 50. The

EA next explains that the DNL for the proposed aircraft operations over each urban

center was calculated using NOISEMAP Version 7.3, which is a suite of computer

programs and components developed by the USAF to predict noise exposure due to

aircraft operations. AR 00051.

The United States Environmental Protection Agency in 1974 established that

continuous and long-term noise levels in excess of DNL 65 dBA are unacceptable for

noise-sensitive land uses such as residences, schools, churches and hospitals. AR 00051.

According to the EA, the estimated DNL under the CAS wheel would never exceed DNL

---

[2] The EA sets forth the various noise metrics developed to describe noise, which include:

- Maximum Sound Level ($L_{max}$) – $L_{max}$ is the maximum sound level in decibels. For example, when an aircraft is directly overhead.
- Equivalent Sound Level ($L_{eq}$) - $L_{eq}$ is the average sound level in decibels of a given event or period of time.
- Sound Exposure Level (SEL) - SEL is a measure of the total energy of an acoustic event. It represents the level of a 1-second long constant sound that would generate the same energy as the actual time-varying noise event such as an aircraft overflight. SEL provides a measure of the net effect of a single acoustic event, but it does not directly represent the sound level at any given time.
- Day-night Sound Level (DNL) - DNL is the average sound energy in a 24-hour period with a 10 dB penalty added to the nighttime levels. Because of the potential to be particularly intrusive, noise events occurring between 10 p.m. and 7 a.m. are assessed a 10 dB penalty when calculating DNL. DNL is a useful descriptor for aircraft noise because: (1) it averages ongoing yet intermittent noise, and (2) it measures total sound energy over a 24-hour period. DNL provides a measure of the overall acoustical environment, but as with SEL, it does not directly represent the sound level at any given time.

37 dBA. AR 00051 – 52. Thus, the USAF concluded that, because the DNL from aircraft operations would be less than 65-dBA DNL, it would always be below the noise level for which all land uses are fully compatible. AR 00052.

Accordingly, the USAF concluded that the CAS Urban training program would have long-term impacts due to a general intermittent increase in aircraft noise in the urban centers where the CAS training would take place. AR 00051. Under a conservative analysis, which assumed surge level training events would occur in one urban center, "individual high-altitude overflights would be audible, but distant, to individuals who are outdoors," and would not interfere with communication or awaken individuals from sleep. AR 00051. The USAF therefore concluded that, because the DNL from aircraft operations would always be less than 65-dBA DNL, the overall level of noise under all training scenarios would be below existing background noise levels and would blend naturally with the existing soundscapes in the nine urban areas selected. AR 00052.

The EA assessed also the operational noise levels from individual F-15E and F-15SG overflights, analyzing the effects of individual flights upon speech and communication, and sleep. The USAF determined that a four-aircraft formation of F-15SG aircraft flying at 10,000 feet would have an SEL dBA of 72.3, and an $L_{max}$ dBA of 59.3, while a four-aircraft formation of F-15E aircraft flying at 10,000 feet would generate an SEL dBA of 70.8, and an $L_{max}$ dBA of 57.8. The EA explained that the threshold at which aircraft noise may begin to interfere with speech and communication is 75 dBA, while the threshold at which aircraft noise may begin to interfere with sleep is 90 dBA SEL. AR 00053 – 54. Because the sound levels of a four-aircraft formation

**MEMORANDUM DECISION AND ORDER - 6**

would be appreciably lower than the thresholds for interference with speech,

communication, or sleep, the USAF concluded that sound levels for high-altitude flights

would have a negligible impact. AR 00053 – 54.

Based upon the noise analysis, the EA summarized the project's impacts with

respect to noise, in comparison with the no action alternative:

| Resource Area | Proposed Action Alternative | No Action Alternative |
|---|---|---|
| Noise | Adverse impacts would be minor and intermittent. Urban CAS aircrew proficiency training would result in a general intermittent increase in noise due to individual overflights. Overflights would generate distant noise that would be audible to individuals who are outdoors, but would not interfere with communication or awaken individuals from sleep. Therefore, adverse impacts would be minor. | Noise levels in the environment would remain unchanged from existing conditions. Commercial and civilian aircraft flight activities and traffic from nearby highways would continue to be the main sources of noise. |

AR 00044.

Over the Boise metropolitan region, the CAS wheel includes surrounding areas,

such as the Boise Foothills, and the Snake, Boise, Bruneau, and other rivers. AR 00062 –

64; 02865 – 67; 21202 – 16; 21657 – 60; 22822 – 58; 22970. These areas include riparian

habitats and public lands having many bird and wildlife species, including bald and

golden eagle, ferruginous hawk, Brewers sparrow, loggerhead shrike, burrowing owl,

greater sage-grouse, and Townsend big ear bat, among others. *See, e.g.*, AR02929–33;

AR02947–55.

The EA addressed the effects of the Urban CAS training program on migratory

birds, concluding there would be "no additional effects…expected" because:

> the overall number of air operations would remain the same,
> only distributed among the installation, MHRC, and the nine
> urban centers. The slight increase in aircraft operations within

> the urban center airspace operations areas would not have an appreciable effect on migratory birds. Takeoff and landing would continue to occur out of Mountain Home AFB. Aircrews would adhere to existing USAF flight safety regulations and Bird/Wildlife Aircraft Strike Hazard (BASH) protocols to avoid impacts on migratory birds (Mountain Home AFB 2012). Bird strikes rarely occur above altitudes of 3,500 AGL, and training over the urban centers would occur between 10,000 and 18,000 ft AGL (FAA 2018). Continuing adherence to existing BASH protocols would limit the potential adverse effects. Therefore, no effects on biological resources would be expected.

AR 00047. The EA summarized the effects of noise upon wildlife, concluding that "[n]oise levels…would not be of sufficient magnitude to result in the direct loss of individuals [birds] or reduce reproductive output." AR 00047.

Finally, the EA addressed the potential impacts upon minority and low-income residents. Because the training could occur anywhere within a 15NM radius of the nine selected city centers, every population therein would be equally as likely to experience effects. Relying upon the DNL from aircraft operations, the USAF concluded noise levels would not impact any populations within the airspace or ground operations areas for the identified urban centers, and would therefore not disproportionately impact either minority or low-income groups. AR 00048.

The USAF considered other alternatives, discussed in Sections 2.4 and 2.5 of the EA. AR 00041 – 43. The No Action Alternative contemplated that Urban CAS training would continue to be conducted only on the Mountain Home Air Force Base ("MHAFB") and in the Mountain Home Range Complex ("MHRC"), which included consideration of simulating a medium or large urban environment. AR 00041. The no

action alternative was rejected, because of the inability to simulate the dynamic environment of an urban community. AR 00041. Other proximal urban centers were similarly rejected as not meeting the selection criteria required to accommodate proposed training. AR 00041 – 42. Other alternative locations, such as Hill AFB in Utah, Nellis AFB in Nevada, the Urban Target Complex in Arizona, and Eglin AFB in Florida were considered and rejected as viable alternatives because each location failed to meet the selection standard for proximity to Mountain Home Air Force Base. AR 00042 – 43.

Based upon the information and analysis in the EA, the USAF concluded implementation of the Proposed Action would not result in significant environmental impacts, such that preparation of an EIS was unnecessary. The USAF issued its Finding of No Significant Impact on November 7, 2018. AR 000510 – 12.

Plaintiffs filed the complaint in this action on April 1, 2019. (Dkt. 1.)[3]

## DISCUSSION

1. **Legal Standards**

   A. *National Environmental Policy Act*

The National Environmental Policy Act ("NEPA") "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). "When the Government conducts an activity, NEPA itself does not mandate particular results.

---

[3] The USAF does not contest that Plaintiffs have standing to pursue their NEPA claims. (Dkt. 18-1 at 10; Dkt. 23.)

Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008) (internal quotation marks and citations omitted).

A threshold question in a NEPA case is whether a proposed project will "significantly affect" the environment, thereby triggering the requirement for an EIS. 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact," or FONSI. *Id*.

If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." *Id*. Taking a "hard look" includes "considering all foreseeable direct and indirect impacts." *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 916 – 17 (9th Cir. 2012)*.* The Court applies the "rule of reason" in evaluating whether an EA contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mt. v. U.S. Forest Serv*., 137 F.3d 1372, 1376 (9th Cir. 1998).

**MEMORANDUM DECISION AND ORDER - 10**

An EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 137 F.3d 1146, 1149 (9th Cir. 1998) (internal quotation omitted)). Thus, to prevail on their claim that the USAF violated its statutory duty to prepare an EIS, Plaintiffs "need not show that significant effects will in fact occur." *Id*. at 1212. It is enough for Plaintiffs to raise "substantial questions whether a project may have a significant effect" on the environment. *Id*.

## B.   *Review Under the APA*

In the context of agency review, "[s]ummary judgment...serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the...standard of review*"* under the Administrative Procedure Act. ("APA"). *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Because of the Court's limited review under the APA, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are determined in agency review cases. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014). Therefore, the Court "is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769 (9th Cir. 1985). Rather, the Court's purpose "is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did." *Id.*[4]

Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *rev'd on other grounds*. "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, [or] if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"[T]his standard is highly deferential, presuming the agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court is to be "most deferential" when, as here, "the agency is making predictions, within its [area of] special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (quotations and citation omitted); *accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). *See also San Luis & Delta-Mendota*

---

[4] The Plaintiffs submitted a statement of undisputed facts with their motion, to which Defendant responded, noting their disagreement with several statements. The Court has considered these disputes in the context of the parties' arguments regarding the USAF's compliance, or lack thereof, with the analysis required by NEPA.

*Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (When examining an agency's "scientific determinations...a reviewing court must generally be at its most deferential.") (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

However, the deference owed an agency is not unlimited. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). The Court does "not automatically defer to any agency's conclusions, even when those conclusions are scientific." *Id.* (quoting *Marsh v. Or. Nat'l Resources Council*, 490 U.S. 360, 378 (1989)). Rather, the Court's review must be "sufficiently probing" to ensure that the agency's decision is "founded on a reasoned evaluation of the relevant factors." *Id.* at 995.

The Court must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners for Wilderness*, 593 F.3d at 1070. Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA...." *Id.* "The [agency's] action ... need only be a reasonable, not the best or most reasonable, decision." *Id.*, and the agency need only articulate a "rational connection between the facts found and choices made," *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The APA does not allow the Court upon review to overturn an agency decision because it disagrees with

**MEMORANDUM DECISION AND ORDER - 13**

the decision or with the agency's conclusions about environmental impacts. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

"Under the APA, courts must refrain from de novo review of the action itself and focus instead on the agency's decision-making process." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1158 (9th Cir. 1980). The Court's review is limited, therefore, to the administrative record to determine whether the federal agency considered relevant factors and reached conclusions that were neither arbitrary nor capricious. *Nw. Motorcycle Ass'n v. U.S. Dept. of Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994).

## 2.      Motion to Strike

Before reviewing the merits, the Court must resolve an initial evidentiary question. Plaintiffs seek to introduce the Declaration of Dr. Jesse Barber, (Dkt. 18-3), to which the USAF objects. Dr. Barber, an Associate Professor with the Department of Biological Sciences at Boise State University, offers several observations concerning the inadequacy of the EA, setting forth his opinions regarding the USAF's failure to adequately analyze the effects of noise from the Project upon the urban landscape and birds and wildlife. Decl. of Barber ¶¶ 7 - 22. Based upon his review of the EA, he concludes the USAF did not present a scientifically credible analysis of the adverse impacts of aircraft noise exposure from the Project upon people, birds and wildlife. *Id.* ¶ 23 – 24.

Dr. Barber explains that the USAF's use of estimated background noise levels in the urban areas affected by the Urban CAS training program grossly underestimates the effect of noise upon many areas within the municipalities that are significantly quieter than the USAF assumes, and that these effects will impact people and wildlife. Plaintiffs

assert that Dr. Barber's opinions are appropriate for the Court to take into account, because he explains the relevant factors and environmental impacts the USAF failed to consider and, therefore, his opinions will help the Court understand how the USAF's challenged decision failed to comply with NEPA. Plaintiffs invoke the "NEPA exception" to the general rule regarding considering matters outside the Administrative Record. (Dkt. 25.)

The USAF argues Dr. Barber's declaration contains extra-record opinions concerning the subject matter of this case, and that he offers opinions and suppositions concerning the USAF's decision. The USFS maintains the opinions expressed in the declaration should have been placed before it prior to the EA and FONSI being issued and, because they were not, Plaintiffs should not now be allowed to present the information to the Court, as the USAF did not have the opportunity to review or address the opinions before making its decisions.

Plaintiffs cite several cases to support their argument that the "NEPA exception" applies. (Dkt. 25.)[5] In one such case, *National Audubon Soc. v. United States Forest Serv.*, the Court of Appeals for the Ninth Circuit recognized that "certain circumstances

---

[5] Although Plaintiffs use the term NEPA exception, Plaintiffs invoke the "relevant factors exception," recognized as one of four exceptions to the general rule prohibiting the consideration of extra-record evidence. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004) (quoting *Sw. Ctr. For Biological Diversity v. U.S.F.S.*, 100 F.3d 1443, 1450 (9th Cir. 1996)) (The Court may consider extra-record evidence where admission of that evidence (1) is necessary to determine "'whether the agency has considered all relevant factors and has explained its decision,'" (2) is necessary to determine whether "'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'").

**MEMORANDUM DECISION AND ORDER - 15**

may justify expanding review beyond the record" where, for example, "an allegation that

an EIS has failed to mention a serious environmental consequence may be sufficient to

permit the introduction of new evidence outside of the administrative record...." 46 F.3d

1437, 1447 (9th Cir.1993) (quoting *Animal Def. Council v. Hodel*, 867 F.2d 1244 (9th

Cir. 1989)).

There, the Ninth Circuit stated:

the district court may extend its review beyond the
administrative record and permit the introduction of new
evidence in NEPA cases where the plaintiff alleges "that an
EIS has neglected to mention a serious environmental
consequence, failed adequately to discuss some reasonable
alternative, or otherwise swept stubborn problems or serious
criticism under the rug."

*Id*. (quoting *County of Suffolk v. Sec. of the Interior*, 562 F.2d at 1384–85 (citations

omitted)). Thus, the Court may "look beyond the record insofar as it is intended to show

that [the agency's] research or analysis was inadequate." *Headwaters, Inc. v. BLM*

*Medford Dist*., 665 F.Supp. 873, 876 (D.Or. 1987). In other words, evidence outside the

record may be admissible if such evidence is "necessary to determine whether the agency

has considered all relevant factors and has explained its decision...." *Southwest Ctr. for*

*Biological Diversity v. U.S.F.S*., 100 F.3d 1443, 1450 (9th Cir. 1996), *quoted in Idaho*

*Conservation League v. U.S. Forest Serv.*, No. 1:11-CV-00341-EJL, 2012 WL 3758161,

at *3 (D. Idaho Aug. 29, 2012) (admitting extra-record evidence upon a finding that the

material was necessary to determine whether the Forest Service considered all relevant

factors in its analysis of groundwater hydrology).

During the public comment period, Plaintiffs raised concerns that noise levels from the Urban CAS training program could result in significant effects upon people and wildlife inhabiting the areas under consideration for military training operations. AR 114 – 509. A number of public comments were critical of the USAF's decision not to conduct a baseline study of noise levels and instead utilize an estimate of background noise applied to the entirety of the airspace within the 30 NM CAS wheel.[6] *See, e.g.,* AR 434 – 435, AR 411 – 412, AR 127 - 131. The USAF responded to these comments that a "noise analysis will be conducted in the EA." AR 127 – 131; AR 461, 465. In response to questions concerning why the USAF did not conduct a baseline noise study of the urban areas impacted, the USAF pointed to its noise analysis in section 3.1 of the draft EA. AR 461 - 465.[7]

Plaintiffs criticize the USAF's response, citing Dr. Barber's declaration in support of their contention that the USAF did not properly consider noise concerns or explain its decision to utilize estimates of background noise levels and other noise metrics. The USAF contends, however, that Dr. Barber improperly questions the wisdom of the agency's decision, and points to the EA's consideration of the effects of noise upon

---

[6] The CAS wheel has a 15 NM radius extending from the urban center. The entire wheel therefore measures 30 NM.

[7] The Court rejects the USAF's argument that Plaintiffs did not raise these concerns during the administrative process. The administrative record reflects that the inadequacy of the USAF's noise analysis was raised numerous times, and by various parties, during the comment period. Moreover, the failure to conduct baseline noise studies and consider the effects of aircraft noise upon wildlife were raised repeatedly. The Court therefore declines the USAF's request to allow expert discovery. The USAF had an opportunity to respond not only to the comments raised during the review process, but also in response to the motion to strike, and chose instead to rest upon the assumptions made by the USAF during review and as finalized in the EA.

**MEMORANDUM DECISION AND ORDER - 17**

people and wildlife. The Court disagrees with the USAF's position, and finds the matters raised in Dr. Barber's declaration are "necessary to determine whether the agency has considered all relevant factors and has explained its decision." *Southwest Ctr.*, 100 F.3d at 1450. Dr. Barber's comments are directed to certain aspects of the USAF's analysis that are lacking, and he does not offer alternative opinions directly commenting upon the wisdom of the USAF's ultimate decision. Therefore, the Court will deny the motion to strike.

**3.     Motions for Summary Judgment**

Plaintiffs raise two main issues. First, they contend that the EA was deficient, because the USAF in the EA did not take a hard look at the potential effects of noise. Second, Plaintiffs contend the USAF has an obligation to prepare an EIS because the agency did not properly assess whether the potential effects of the Urban CAS training program are significant. The Court agrees, and addresses each contention in turn.

**A.     Whether the USAF Took a Hard Look at the Potential Effects of Noise**

Plaintiffs challenge the USAF's decision to proceed with approval of the Project without an EIS, on the grounds that the agency did not take a hard look at the potential effects of noise in the EA. Plaintiffs raise three concerns with the USAF's noise analysis. Plaintiffs allege the USAF failed to: (1) establish an adequate baseline, which caused it to underestimate effects; (2) take a hard look at noise impacts upon sleep, speech and communication, birds and wildlife, and disadvantaged populations; and (3) adequately address cumulative noise impacts of the Urban CAS training program when added to

other military overflights in southern Idaho. Plaintiffs ask the Court to reverse and remand this matter to the agency to prepare a fully compliant EIS. The USAF counters that Plaintiffs misunderstand its noise analysis and asks the Court to defer to its technical expertise.

### (1)   *Adequate Noise Baseline*

Plaintiffs contend the USAF should have gathered site-specific data for each of the impacted areas and criticize the USAF's reliance upon an estimate of background noise levels determined by population density. Plaintiffs contend that the failure to gather actual noise levels for the impacted urban areas and their surroundings, which include natural environments like the Boise Foothills, caused the USAF to underestimate noise impacts because a single baseline noise level was assigned for the entire 30 NM CAS wheel, or training area. Relying upon Dr. Barber's declaration, Plaintiffs explain that the formula used to arrive at the baseline estimates should not be used to predict DNL less than 50dBA. Consequently, Plaintiffs assert the estimate of baseline noise levels leads to misleading results in areas of the urban landscape falling under the CAS wheel that are quieter than 50dBA DNL.

The USAF contends that the use of a model, which estimated existing background noise levels in large, medium, and small urban areas, was reasonable and resulted in a more conservative estimate that overstated potential effects. Further, the USAF asserts that the model accounted for background noise levels in small urban centers and in surrounding recreational areas outside of the urban core, which includes land like the Boise Foothills. And last, the USAF contends that any error in its application of the

**MEMORANDUM DECISION AND ORDER - 19**

model used to estimate background noise levels in the nine sites selected is harmless, because the estimated DNL caused by aircraft participating in the training program would never exceed 37 dBA DNL, well below the 65dBA DNL threshold for which all land uses are fully compatible. The USAF relies upon several district and circuit court opinions, which affirm the use of Federal Aviation Administration regulations establishing the 65 dBA DNL noise threshold below which all land use is compatible, including recreational activities.

The Federal Aviation Administration has established 65 DNL as the threshold of significance for noise impacts. *Seattle Cmty. Council Fed'n v. F.A.A.*, 961 F.2d 829, 833 (9th Cir. 1992) (citing 14 C.F.R. Part 150, App.A, Table 1 (1991)). Aircraft noise at a level below 65 DNL is considered compatible with all land uses, including residential and transient lodgings, mobile home parks, churches, schools, offices, livestock farming, outdoor sports arenas and music shells, nature exhibits, zoos, parks, resorts, golf courses, water recreation, and camps. 14 C.F.R. Part 150, App.A, Table 1 (1991). Actions that do not result in noise level increases of 1.5 dB or more within the 65-or-more DNL contour are, by definition, insignificant under NEPA, because all land use activities at issue are compatible with noise levels below 65 DNL. *See, e.g., City of Bridgeton v. Slater*, 212 F.3d 448, 459 (8th Cir. 2000) (noting that "aircraft noise level is considered compatible with all land uses" outside the 65 DNL contour). Courts have long accepted the FAA's DNL standard as the appropriate methodology for evaluating the impacts from aircraft noise. *Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320, 328 (D.C. Cir. 2003). *See also City of Bridgeton v. FAA*, 212 F.3d 448, 459 (8th Cir. 2000) (finding FEIS

**MEMORANDUM DECISION AND ORDER - 20**

acceptable where the FAA determined that the city and county will be below 60 dB DNL, including all noise from the expanded airport.).

The parties do not dispute that the FAA's DNL threshold is an appropriate metric. Rather, the dispute centers on the use of baseline estimates for ambient sound levels which the USAF applied to the entire CAS wheel within which aircraft will operate. Upon a review of the record, the Court finds the USAF's analysis and conclusion that the Urban CAS training program will have no significant impact upon the urban areas' soundscapes is arbitrary and capricious, for two reasons.

First, the EA makes no attempt to explain the effect of aircraft noise upon areas that are outside the urban core. The USAF relies upon the premise that there is but one DNL applicable to an entire 30 NM CAS wheel, despite acknowledging that the nine urban areas contain natural soundscapes, like the Boise Foothills. *See, e.g.*, AR 22679 (depicting the urban CAS airspace over the Boise Foothills). Based upon its analysis, the USAF asserts that, at altitudes of 10,000 feet or more, aircraft noise will be negligible.

The USAF's analysis and resulting conclusion does not take into account that aircraft noise over natural or quieter soundscapes may appear louder than it would to persons in the city center. The USAF indicates a four-aircraft formation of F-15E aircraft flying at an altitude of 10,000 feet above ground level will have an SEL of 70.8 dBA, and an $L_{max}$ of 57.8 dBA, while the same formation of four F-15SG aircraft will have an SEL of 72.3 dBA, and an $L_{max}$ of 59.3 dBA. Dr. Barber in his declaration states that, by estimating DNL and applying it to the entirety of the 30 NM CAS wheel, the USAF underestimates the effects of aircraft noise upon many areas within the municipalities that

are significantly quieter than the ambient background noise estimates assume, and the

estimates are inapplicable to areas such as the Boise Foothills and other natural habitats.

There appears to be no quantitative assessment undertaken in the EA to assess the noise

impact of overhead flights upon areas that experience background noise at levels much

less than the assumed average.[8] This weakness is concerning because a citizen's noise

complaints about military aircraft noise sent to Boise's mayor in March and April of 2015

prompted the USAF to cease its previously undisclosed Urban CAS training program

over Boise, and begin preparing an EA. AR 21833 - 21838.

Second, the baseline estimates used are unsupported by an explanation in the

record. Although the establishment of a baseline is not an "independent legal

requirement," it is considered a "practical requirement in environmental analysis often

employed to identify the environmental consequences of a proposed agency action." *Ore.*

*Natural Desert Assoc. v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016). If an agency estimates

baseline conditions, whether through use of a computer model or some other reasonable

method, the assessment "must be based on accurate information and defensible

reasoning." *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).

Here, however, there is no explanation in the record why the USAF chose to

utilize an estimate based upon population density, and then apply it to a 30 NM area. AR

09851. *But cf. Great Basin Resource Watch*, 844 F.3d at 1102 (finding choice of baseline

---

[8] For example, in *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345-46 (D. D.C. 2002), the court examined the impact of commercial jet flights over Zion National Park, a naturally quiet environment. The court noted that "an increase of 10 dBA correlates to a doubling of loudness such that a commercial jet overflight at the Park may be 4 to 23 times as loud as the natural soundscape." 290 F.3d at 345.

**MEMORANDUM DECISION AND ORDER - 22**

for particulate matter obtained from a similar rural area adequate given the BLM's explanation). Nor is there an explanation supporting the USAF's use of this particular model. The choice is not supported when the Court considers that the ANSI model indicates the DNL averages for residential areas are based upon the number of people per square mile. By its terms, the model applies only to the urban centers, not to surrounding land within the 30 NM CAS wheel that may be sparsely inhabited.

Moreover, the ANSI model contains a disclaimer that the use of the table and formula for estimating ambient background noise levels is not recommended when the predicted DNL falls outside of a range between 50 and 70 dB. "Outside of this range, 50 to 70 dB, predictions are not recommended," and thus the DNL levels indicated in the table for "quiet suburban residential" and "very quiet suburban and rural residential" are simply approximations. AR 09851. The model states also that the equation to estimate DNL "should not be used" to predict DNL outside the range of 50 to 70 dB. AR 09851; Decl. of Barber ¶¶ 12 - 14.

The USAF did not acknowledge ANSI's disclaimer that the model should not be used if the predicted DNL falls outside the range of 50 to 70 dB. Within the EA, there is no effort to disclose or otherwise explain why or how the DNL estimates applied to recreational areas outside of the urban core, or to rural areas selected for Urban CAS training that have an estimated DNL of 40 dBA, such as Grand View, Bruneau, Glenns Ferry, and Hammett. AR 00050. *C.f. Great Basin Resource Watch*, 844 F.3d at 1102 (finding that by acknowledging the shortcomings in its data, the BLM complied with NEPA). ANSI's disclaimer also causes the Court to question the application of the

model's estimates to Mountain Home, Burley, and Twin Falls, identified in the EA as medium urban centers, which were all given an DNL estimate of 52 dBA. This estimate is very close to the low range of the model.

Without an assessment of baseline conditions, especially in areas that experience DNL averages outside of a range of 50 to 70 dBA, the USAF's reasoning is not supported. There is no explanation supporting the USAF's choice to use estimated DNL levels and apply the estimates to the entire 30 NM CAS wheel given ANSI's disclaimer attached to the model. Here, the USAF provided neither data nor reasoning in support of its choice to use baseline estimates and forego collection of actual data.

The Court therefore concludes the USAF's analysis of noise impacts in the EA was inadequate, because the agency did not provide support for its use of estimated DNL baseline values, and therefore did not take the requisite hard look required by NEPA.[9]

**(2)** *Noise Impacts*

*i.* *Sleep*

Plaintiffs argue the USAF failed to take a hard look at potential interference upon sleep from the Urban CAS training program for three reasons: (1) Plaintiffs argue the

---

[9] The Court does not find the USAF's argument that any error was harmless persuasive. The USAF argues that any change in baseline conditions over or under the estimated DNL applied to the entire 30 NM CAS wheel would not result in a change to the USAF's analysis, because the noise from the aircraft is not significant. This argument is premised upon the assumption that the estimated DNL from aircraft activity, by itself, would never exceed 37 dB DNL. AR 20367. This argument fails to account for the possibility of an increase in the ambient sound level by virtue of aircraft overflights. *See* AR 13586. *See also Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320, 326 (D.C. Cir. 2003) (the "FAA examined the relative change in aircraft noise caused by the Plan, and evaluated the overall impact of the change in aircraft noise by performing a logarithmic calculation to account for the actual impact of the project as added to the existing ambient noise levels."). Even if there would be no increase in ambient sound levels due to aircraft noise, the EA contains no analysis explaining why there would be none.

sleep interference threshold of 90 dBA presumed a 25 dB noise reduction attributable to a building envelope, and therefore assessed only the probability of awakening individuals sleeping indoors with closed windows; (2) Plaintiffs contend the EA did not acknowledge that SEL 90 dBA is the threshold for a single noise event to cause awakening, and thus the EA did not analyze the impact of repeated noise events throughout a full night as opposed to single events; and, (3) Plaintiffs assert that the EA did not address other impacts of nighttime noise, such as impaired or delayed sleep. AR 01626,[10] AR01525.

The USAF contends that the threshold of SEL 90 dBA is the outdoor SEL threshold at which sound may begin to interfere with sleep. AR 09868. Here, the EA indicates that the maximum SEL for an F-15SG four-aircraft formation is 72.3 dBA, and 70.8 dBA for an F-15E four-aircraft formation. Accordingly, the USAF concluded that, because the SEL of the loudest aircraft formation is less than 90, flight activities would not result in sleep interference. The USAF argues also that the specific number of flyovers at night is not relevant, because the aircraft's SEL does not exceed 90 dBA.

SEL represents the total noise exposure of one individual aircraft overflight. AR 09859. The USAF calculated SEL for one, two, and four aircraft formations assuming a cruising speed of 280 knots and power settings of 73.5 percent. AR 00053. The EA explains that "it would take more than one-hundred F-15SG or F-15E aircraft flying over a single location simultaneously to interfere with sleep," and therefore the USAF

---

[10] Plaintiffs cite to AR 01626, the EA prepared for the Republic of Singapore Air Force F-15SG Beddown Project at Mountain Home AFB as an example of where the USAF addressed the issue of impaired or delayed sleep.

concluded noise impacts on sleep from its training activities would be negligible. AR 00054.

To evaluate the impacts on sleep, the USAF relied upon the supplemental noise metrics and analysis tools set forth in the Department of Defense's technical bulletin published in December of 2009. AR 09852. According to the technical bulletin, a single noise event at SEL 90 dBA has a 1% probability of awakening an individual at least once during the night with the windows closed, and a 2% probability of doing so with the windows open:

**Probability of Awakening at Least Once From Multiple Events at SEL 90 dB**

| NA90SEL | Windows Closed* | Windows Open** |
|---|---|---|
| 1 | 1% | 2% |
| 3 | 4% | 6% |
| 5 | 7% | 10% |
| 9 | 12% | 18% |
| 18 | 22% | 33% |
| 27 | 32% | 45% |

\* Windows Closed' assumes that there is a 25 dB noise level reduction (NLR) between the outdoors and indoors, e.g., 90 SEL outdoors is 65 SEL indoors.
\*\*'Windows Open' assumes that there is a 15 dB NLR between the outdoors and indoors, e.g. 90 SEL outdoors is 75 SEL indoors).

AR 09868. As the number of outdoor noise events occurring at SEL 90 dBA increases, so do awakenings.

Plaintiffs are correct that the EA does not discuss the impact upon persons sleeping outside, such as homeless populations or persons recreating in backcountry areas, within the 30 NM CAS wheel. The technical bulletin expressly states that the standard "predict[s] awakenings associated with outdoor noise events *heard in the home*." AR 09868 (emphasis added). The EA therefore does not appear to address the impact of

**MEMORANDUM DECISION AND ORDER - 26**

noise events upon persons who do not have the benefit of a 25dB noise reduction from a building envelope.

Nor does the EA consider the impact of multiple events occurring during the night throughout the CAS wheel, which is relevant according to the table above. The EA indicates a training operation will last between 60 – 90 minutes, which may involve multiple overflights throughout the 30 NM wheel during that period.[11] The standard indicates that, as the number of noise events increase, the probability of awakening increases as well. The EA does not acknowledge this fact at all. Rather, the EA simplistically leaps to that conclusion by relying upon an example of one hundred aircraft flying simultaneously over a single location. Thus, the analysis does not account for the number of overflights that will occur during a 60 – 90 minute training operation; the fact that there may be two training operations in the same airspace during the night; and that multiple aircraft may not be flying in a predetermined flight path during the training operation. *See* AR 00023.

Further, contrary to the USAF's assertion that noise impacts will be negligible because aircraft noise will never reach a level of SEL 90dBA, there is evidence in the administrative record that sound levels below SEL 90dBA may cause awakenings

---

[11] The EA indicates Urban CAS operations are discussed in terms of training events, training operations, and sorties. "A training event involves a collection of training operations conducted within a 24-hour period. A training operation involves the roundtrip (i.e., departure and return) flights of multiple F-15E and/or F-15 SG aircraft from the installation. The roundtrip of each aircraft out to and returning from the training area is one sortie operation (i.e., flight operation)." AR 00015.

depending upon the number of events. AR 00412.[12] There is evidence also that the sound of a four-aircraft formation will be audible. For instance, an SEL of between 70 to 75 dBA sounds like a vacuum cleaner or living room music. AR 01615. There was no mention in the EA of any attempts taken to quantify or explain the effects upon sleep at sound levels below SEL 90 dBA.

The EA's failure to address sleep interference is troubling in light of the USAF's robust discussion of sleep interference, including sleep arousal, in its March 2007 EA addressing the Republic of Singapore Air Force F-15SG Beddown at MHAFB. The discussion was included because of the "intermittent nature and content of aircraft noise, which is more disturbing than continuous noise of equal energy and neutral meaning." AR 01626. The study relied upon there indicates that, at an SEL of less than 79, sleep disturbance can occur. The USAF failed to discuss these studies here, and did not conduct any analysis of the project's effects upon sleep interference.

One final aspect of the noise metrics utilized by the USAF in the EA bears mention, as Plaintiffs did during the hearing. Plaintiffs argued that the metrics selected to analyze noise impacts were more suitable to evaluate the impacts emanating from a fixed location, such as an airport, with known flight patterns. Here, in contrast, the flight paths of the aircraft are unknown, and thus noise impacts may occur anywhere within a 15 NM radius from the urban center. Plaintiffs astutely note that the DOD's Technical Bulletin

---

[12] During the public comment period, Plaintiffs submitted a graph illustrating the impact of multiple aircraft overflights during sleep at various indoor sound exposure levels.

indicates the metrics discussed therein are best suited to measure noise in communities around civilian airports and military facilities. AR 09854.

Plaintiffs have raised serious questions concerning whether the metrics used by the USAF in the EA adequately assess the impacts from repeated noise events occurring throughout a 30 NM airspace for up to 90 minutes several times each day and night. Therefore, the Court concludes the USAF's analysis in the EA of noise impacts upon sleep was inadequate. The USAF did not provide sufficient support for its conclusion that multiple night sorties occurring during training operations lasting anywhere from 60 – 90 minutes, at an SEL of up to 72.3 dBA, would have negligible effects upon sleep in vastly different urban areas, with potentially wide disparities in existing ambient noise levels. *See* AR 00050 (listing various noise sources).

ii.     *Speech Interference*

Plaintiffs next contend the EA does not adequately address the potential speech interference impacts from aircraft noise. Plaintiffs assert a similar argument as they did with the USAF's sleep analysis. They contend that the use of the 75 dBA $L_{max}$ threshold assumes a 25 dBA reduction when indoors, and does not adequately account for the impact of multiple flyovers upon outdoor speech in general, or upon speech occurring in natural soundscapes and quiet recreation areas, where elevated background noise may be more pronounced.

The USAF argues it correctly relied upon the 75 dBA $L_{max}$ threshold to evaluate interference with speech and communication, both indoors and out, and that this threshold represents noise events occurring outdoors.

**MEMORANDUM DECISION AND ORDER - 29**

The EA's noise impact analysis upon speech interference indicates that the maximum sound level for a four aircraft formation of F-15Es at 10,000 ft AGL would be 57.8 dBA $L_{max}$, while the same formation of F-15SGs would be 59.3 dBA $L_{max}$. Relying upon the threshold at which aircraft noise may begin to interfere with speech and communication, which is 75 dBA $L_{max}$, the USAF concludes in the EA that sound levels would be appreciably lower than the threshold for speech interference and, therefore, noise impacts on speech communication would be negligible. AR 00053-54.

The Court finds the USAF violated NEPA by failing to disclose and discuss the limitations of the standard relied upon in the EA. First, the DOD's technical bulletin indicates the NA75 $L_{max}$ threshold is used to evaluate speech interference in the classroom, and assumes a windows closed school environment. AR 09868. Nowhere does the technical bulletin discuss how to evaluate the impacts from noise events upon speech in environments other than classrooms, or outside. The EA did not disclose the limitations of the NA75 $L_{max}$ metric, and did not include a discussion of the impacts from repeated noise events to people conversing outside, where elevated background noise may be more apparent. *See Grand Canyon Trust*, 290 F.3d at 345 (recognizing that jet overflights above Zion National Park may be 4 – 23 times as loud as the natural soundscape).

Second, the DOD Technical Bulletin relied upon by the USAF expressly mentions the need to evaluate the number of operations during a selected time period to determine the impact upon speech in an indoor, classroom environment. AR 09869. Here again, the EA discusses only the impact of a single noise event, and does not analyze the impact of

**MEMORANDUM DECISION AND ORDER - 30**

multiple training operations involving multiple sorties that may occur during the day within the 30 NM CAS wheel. Instead, to bolster its conclusion that aircraft noise will not impact speech, the USAF again utilizes the example of one hundred aircraft flying overhead simultaneously. But this does not explain the effect, if any, of multiple noise events expected during two 60 – 90 minute training operations conducted during the day.

       *iii.*    *Birds and Wildlife*

Plaintiffs contend the EA did not take a hard look at the potential impacts of noise on birds and wildlife, and cursorily concluded that noise would not impact birds and wildlife without providing supporting data. AR 00047. Plaintiffs rely upon Dr. Barber's declaration describing the impact of noise upon birds and wildlife, in which he notes that the USAF failed to reference any studies or research articles in dismissing impacts to birds or wildlife. Decl. of Barber ¶ 15. (Dkt. 18-3.)

The USAF contends the EA addressed potential effects of the program upon birds and wildlife. Here, the USAF concluded that training exercises would have no effect upon birds and wildlife because the overall number of air operations would remain the same, and training over urban centers would occur at 10,000 feet above ground level, which far exceeds the 3,500 AGL at which bird strikes occur. AR 00047. The EA states that noise levels associated with the program "would not be of sufficient magnitude to result in the direct loss of individuals or reduce reproductive output," and that wildlife conservation and refuge areas would be avoided. AR 00047.

The EA contains one conclusory statement, without any supporting data, that noise levels associated with the Urban CAS training program would not be of sufficient

magnitude to result in the direct loss of individuals or reduce reproductive output, without identifying and considering the species that may be affected in each of the urban areas. Further, while the overall number of operations would remain the same, the USAF is proposing to re-distribute existing flights limited to the airspace over MHAFB over nine different urban centers, and potentially alter the noise levels in these locations. There is no logical connection between the USAF's conclusion that birds and wildlife will not be affected because the number of flights will not change, when the redistribution of these flights appears more relevant to the analysis.

As Plaintiffs noted, the lack of analysis here is in stark contrast to the extensive analysis in the USAF's 2007 EA concerning the Republic of Singapore Air Force F-15SG Beddown at MHAFB, which discussed the effects of that project upon wildlife found on and immediately surrounding the base. AR 01559 – 01564. There, the USAF documented that noise impacts upon wildlife on and immediately surrounding MHAFB are limited due to the lack of suitable or undisturbed habitat. AR 01559. It identified the wildlife species potentially impacted, and contained a detailed explanation as to why there would not be an appreciable effect upon each species. Here, in contrast, the USAF proposes to redistribute existing training flights, which now utilize the airspace over MHAFB, over nine urban centers without identifying the birds and wildlife that may be impacted, and without any discussion supported by scientific studies to support the conclusion of no impact. *See, e.g.,* AR 01564 (discussing the impact of noise upon birds and wildlife surrounding the MHAFB).

Dr. Barber cites numerous scientific studies that address the effects of noise upon various wildlife species, especially birds. Decl. of Barber ¶¶ 15 – 22. (Dkt. 18-3.) In reviewing case law involving other proposed projects, other agencies include a discussion in their EAs of the effects of noise upon wildlife due to proposed projects. *See, e.g., Ocean Mammal Institute v. Gates*, 546 F.Supp.2d 960, 975 (D. Haw. 2008) (considering whether the Navy adequately analyzed the impact of noise upon aquatic species to be affected by undersea warfare exercises in the Hawaiian Islands.) In *Ocean Mammal Institute,* for instance, the court was critical of the Navy's use of noise threshold levels that did not adequately reflect the level at which negative behavioral responses in wild marine mammals may occur.

Here, the USAF in the EA has not supported its conclusion that birds and wildlife will not be affected by noise. There is no metric identified, no species identified, and no scientific literature referenced to support the USAF's conclusion that noise levels associated with the program would not be of sufficient magnitude to result in the direct loss of individuals or reduce reproductive output. Accordingly, the Court finds the USAF acted arbitrarily and capriciously in concluding that the Urban CAS training program will not significantly affect birds and wildlife.

### iv.    Environmental Justice Issues

Finally, Plaintiffs contend the EA did not adequately consider the impacts of noise upon minority and low-income populations, in violation of Executive Order 12898. Plaintiffs identified two flaws with the EA's analysis – first, that the EA did not consider the proportion of low-income and minority residents in target cities; and second, that the

EA did not consider that low-income and minority residents may be more susceptible to adverse noise impacts than the general population. For example, such communities may reside in inadequate housing, or lack housing at all, thus experiencing greater noise impacts.

The USAF contends there is no right of review under Executive Order 12898, and alternatively explains, the USAF adequately considered environmental justice issues in the EA. Having concluded that noise levels would not impact any populations, the USAF concluded that minority and low income populations would not be disproportionately affected. AR 00048.

Executive Order 12898 requires that, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations" within the area affected. 59 Fed. Reg. 7629 (Feb. 11, 1994). The Order "does not create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person," and the order may not "be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order." *Id. See also Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (Executive Order 12898 does not create a right to judicial review for alleged noncompliance.) There is thus no cause of action created by Executive Order 12898. *See Protect our Communities Found. v. Salazar*, No. 12CV2211-GPC PCL,

**MEMORANDUM DECISION AND ORDER - 34**

2013 WL 5947137, at *15 (S.D. Cal. Nov. 6, 2013), *aff'd sub nom. Backcountry Against Dumps v. Jewell*, 674 F. App'x 657 (9th Cir. 2017) ("It does not appear the Ninth Circuit allows a cause of action under Executive Order 12898 even if brought under the APA.").

Even if judicial review of Executive Order 12898 were available under NEPA and the APA, the Court finds the USAF's consideration of environmental justice impacts are too cursory. The USAF reasoned that, since no one will be affected by noise impacts, disadvantaged populations will not be affected. However, given the Court's finding that the USAF's use of baseline noise estimates and its noise impact analysis upon sleep and speech set forth in the EA are flawed, the USAF's conclusion lacks sufficient support in the record.

### (3)   *Cumulative Impacts*

An EA must contain a cumulative impact analysis. *Kern v. U.S. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002). A "cumulatively significant impact" is an impact on the environment that results from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions." *Id*. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005).

In considering cumulative impacts, an agency must provide "some quantified or detailed information; ... [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id*. This cumulative analysis "must be more than perfunctory; it

must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id*.

Plaintiffs contend the USAF violated NEPA because it did not address the cumulative noise impacts of the Urban CAS training program when added to other military overflights in southern Idaho. Plaintiffs criticize the  perfunctory analysis in the EA that cumulative noise impacts upon urban centers would be minor given the high level of military aircraft activity out of MHAFB that already exists.

The USAF argues that the EA adequately addresses cumulative impacts, because the Urban CAS training program will not increase military aircraft operations in southern Idaho, but rather will distribute existing aircraft operations among the installation's ranges and airspaces, and urban centers. AR 00020. The USAF argues the cumulative impacts from the Urban CAS training program would not be significant because the program would not alter the number of flights.

The EA explains that, currently, the baseline total for airfield sorties and operations at MHAFB is approximated at 60,559 operations per year and includes all MHAFB and transient aircraft operations. AR 00015. Urban CAS training is presently restricted to MHAFB and its ranges. AR 00015. The USAF conducts approximately 160 training events involving approximately 960 sortie[13] operations on the installation for Urban CAS training. AR 00015. The Proposed Action would not increase sortie operations, but would distribute the existing 160 training events presently confined to the

---

[13] The roundtrip flight of each aircraft out to and returning from the training area is one sortie. AR 00015.

installation over the nine urban centers selected for training operations. AR 00020, 00022.

The EA considered the cumulative impacts of the proposed Urban CAS training program on the ambient noise environments of the urban centers together with other projects expected to increase regional air traffic. AR 00094. The USAF concluded in the EA that the anticipated contribution by the proposed Urban CAS training program to increased noise levels across the region of impact would be negligible in comparison with the existing and projected noise from commercial, recreational, military, and private aircraft flights in the region. AR 00094. The EA indicates that the USAF did not identify any noise producing activity or project that, when combined with the Proposed Action, would have greater than minor, adverse impacts on sensitive noise receptors in the environment. AR 00094.

The USAF's argument that the EA adequately considered cumulative impacts because the number of flights from MHAFB would remain the same is not convincing. The EA acknowledged that the proposed F-15E and F-15SG training operations "could result in a perceptible increase in the presence and operation of military aircraft in the local airspaces," where none had been before because training operations were confined to airspace above MHAFB. AR 00094. The redistribution of existing aircraft operations over urban centers does not translate into a conclusion that there will be no cumulative impact. The redistribution changes the concentration of aircraft and associated noise over the nine urban centers selected for training operations, and may intensify the noise from existing noise producing activities.

**MEMORANDUM DECISION AND ORDER - 37**

And, although the EA contains a cumulative effects analysis with respect to noise, the USAF's conclusion is unsupported due to the flaws in its noise analysis, discussed above. Instead, the USAF simply arrived at a conclusory determination that there will be no significant cumulative effect upon the ambient noise environment. This conclusion is reached even though, after conducting a preliminary run-through with operational data, the USAF knew that an F-15E "will be clearly audible to individuals in the ground," and "communities could expect substantial changes in the level of noise in their ambient environments. Group consensus was that these changes would be especially concerning in the small, rural communities…. Additional data would be needed to either clarify and refine the analyses or to determine and incorporate another implementing alternative." AR 20437, 20318. This knowledge is especially concerning given the USAF intended as its preferred alternative to conduct "maximum operations at any one of the 7 urban centers," and anticipated surges in night training exercises when readying for deployment every three years. AR 20437. The USAF suggested at the hearing that its assessment was preliminary, and that the USAF expressed that additional data was necessary to clarify uncertainty. However, upon review of the EA, the data relied upon appears as if the USAF chose particular metrics to play down the the known effects of military aircraft noise upon urban communities. *See, e.g., Ocean Mammal Institute*, 546 F.Supp.2d at 975.

Last, the USAF acknowledges in the EA's discussion of cumulative impacts, for the first time, that there will be an "incremental increase in aircraft noise in the urban center where operations are actually occurring," AR 00094, but the EA never quantifies this increase in either the noise analysis or the cumulative effects analysis. Rather, the EA

estimated the DNL of aircraft operations by themselves, without discussing the aggregate noise impact of the operations upon each of the nine urban centers. Absent such an analysis, the Court finds the USAF acted arbitrarily and capriciously in determining the additional noise projected to result from Urban CAS training would not have a significant environmental impact upon the areas under consideration for training operations.

**B.      Whether the USAF Considered a Reasonable Range of Alternatives**

Plaintiffs contend the USAF refused to consider alternatives proposed by Plaintiffs and others during the public comment period, which included: (1) using simulators; (2) building an urban range at another MHAFB site that would not disturb their gunnery range; (3) a combined alternative of simulations, range development, and a small number of training flights; (4) limiting the Project's duration to allow for detailed future analysis of concrete data; and (5) splitting the Boise airspace into "holding" and "employment" sides to minimize noise impacts, as the USAF did when conducting urban CAS training over Boise prior to 2015. Plaintiffs argue that the USAF considered only the status quo and the proposed action, which they contend is insufficient to satisfy NEPA.

The USAF argues that Plaintiffs have not met their burden to show that the proposed alternatives were viable, citing *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013). The USAF contends that it considered proposed alternatives, but concluded options one, two and three did not have the capability to simulate the dynamic environment of an urban community. AR 00041. As for the fourth alternative, the USAF contends Plaintiffs did not identify concrete data that needed to be collected. Finally, the USAF contends the proposed action accomplishes "splitting" of the Boise

airspace, because aircraft will be held outside of the urban center at the outermost edge of the 30 NM operating area, along the perimeter of the CAS Wheel, until called in to participate in the training event. AR 00022, 00025.

While an agency's EA needs not address every conceivable alternative presented to it, NEPA mandates that federal agencies "[s]tudy, develop, and describe alternatives to recommended courses of action in any proposal which involves conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Any EA "[s]hall include a brief discussion of alternatives...." 40 C.F.R. § 1508.9(b). "Consideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir. 1988). *See City of Aurora v. Hunt*, 749 F.2d 1457, 1466–67 (10th Cir. 1984) (FAA not required to analyze in detail alternatives it rejects in good faith as too remote, speculative, impractical, or ineffective); *Allison v. Department of Transp.*, 908 F.2d 1024, 1031 (D.C. Cir. 1990) ("The FAA need not examine an infinite number of alternatives in infinite detail."). "The 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)).

An agency is "entitled to identify some parameters and criteria—related to Plan standards—for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives." *Id.* (quoting *Mumma*, 956 F.2d at 1522). The "touchstone for [the Court's] inquiry is whether an EIS's

**MEMORANDUM DECISION AND ORDER - 40**

selection and discussion of alternatives fosters informed decision-making and informed public participation." *City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir. 1986) (internal quotations and citation omitted); *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998).

The USAF indicates in the EA that it supports a proposal by the 366th Fighter Wing of the USAF to "establish ground and airspace training areas at urban centers near Mountain Home Air Force Base (AFB) where crews" from the 366th FW can conduct Urban CAS training operations. AR 00012. The USAF explains that, during combat, Urban CAS operating environments present unique difficulties that cannot be replicated unless training occurs in similar environments over established urban centers. AR 00012 – 00015.

The USAF defined the parameters and criteria for selection of urban centers as follows: (1) must be located within a 30 mile radius of MHAFB; (2) must include a variety of population sizes and densities to simulate a range of community dynamics encountered during urban combat; (3) must have the physical attributes to adequately simulate the challenges presented by urban environments encountered during combat; and (4) must have development features indicative of the required extents of artificial lighting that would simulate the range of built environments encountered during day and night combat missions. AR 00015 – 00028. The USAF then considered multiple urban centers near MHAFB, eventually settling on nine that met project parameters.  AR 00029 – 00040.

**MEMORANDUM DECISION AND ORDER - 41**

The alternative prominently discussed by the USAF in the EA was the "no action alternative," which would continue the practice of conducting Urban CAS proficiency training at MHAFB and in the MHRC. The USAF rejected this option, because it did not effectively simulate an urban environment, and it lacked the required population, vertical development, and artificial lighting. AR 00041. The USAF rejected the idea of developing a suitable simulated environment, concluding it was not feasible. AR 00041. The USAF rejected also the utilization of proximal urban centers near the nine selected. And last, the USAF rejected the idea of conducting operations at other proximal military installations, because they were too far from MHAFB. The use of other locations was essentially a non-starter due to the selection criteria and project parameters. And there was little analysis to support the USAF's conclusion in the EA that the no action alternative could not meet the USAF's objectives, despite currently conducting 160 Urban CAS training events each year over MHAFB and in the MHRC. AR 00015, 00041.

Nor did the USAF consider other potentially viable alternatives. For instance, option three, which would combine the use of MHAFB and the MHRC, as well as simulations, together with a more limited amount of training operations over selected urban centers, arguably would meet the USAF's stated objective of conducting training operations over urban environments, albeit on a more limited basis. During preliminary discussions, the USAF indicated the suggested alternative to split operations between MHAFB and urban centers would simply be dismissed as not meeting selection standards. AR 20320. But there was no explanation why the USAF needed to conduct all

**MEMORANDUM DECISION AND ORDER - 42**

160 of its Urban CAS training events over urban centers to meet the stated objectives, which simply required actual urban environments for training but never quantified the number of training events that may be adequate to achieve proficiency.

There also was no consideration given to option five, which would have allowed for Urban CAS training operations but without the use of a CAS wheel. Contrary to the USAF's argument, the use of airspace along the entire perimeter of the CAS wheel versus confining aircraft to a holding area is not equivalent. AR 20319. It is clear from the Administrative Record that the two options for use of airspace are not the same, because the USAF indicated the CAS wheel was designed so that operators could utilize the entirety of the airspace within the 15 NM radius of the centerpoint of the urban center to conduct training. AR 20319.  The USAF rejected this alternative early on, with no explanation other than that the arrangement would not be necessary because preliminary assessment data confirmed noise impacts would be negligible. *Id.* However, because of the failure, discussed above, to take a hard look at noise impacts, the USAF's conclusion lacks sufficient support.

The presence of a "viable but unexamined alternative renders [the] environmental impact statement inadequate." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quoting *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)). Continuing operations utilizing a holding area, or conducting a reduced number of training events distributed over the nine urban centers, appear to be feasible alternatives that were ignored. Both options achieve the stated objective of providing an urban environment for CAS training. Yet, neither option was considered. In

**MEMORANDUM DECISION AND ORDER - 43**

essence, the USAF's alternatives analysis consists of a preferred option, which would allow the USAF to conduct the maximum number of Urban CAS training events over one or more of the nine urban centers identified, and no other option, because the continuation of Urban CAS training at MHAFB would not meet project objectives. "The kind of thorough consideration of environmental values called for by NEPA is not possible when the end result…is predetermined." *Ocean Mammal Institute v. Gates*, 546 F.Supp.2d 960, 977 (D. Haw. 2008).

NEPA "does not mandate particular results," but "simply provides the necessary process" to ensure that federal agencies take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The Court concludes that in this case, the USAF failed to consider or analyze adequate, and viable, alternatives to the proposed action.

### C.    The Significance Factors

In addition to their argument that the EA was deficient, Plaintiffs claim the USAF is obligated to prepare an EIS because there are substantial questions about whether the Urban CAS training program may cause significant degradation of the human environment. *See* 42 U.S.C. § 4332(2)(C). Plaintiffs point to three of the ten significance factors, claiming they have raised substantial questions with respect to: "the degree to which the effects on the quality of the human environment are likely to be highly controversial;" "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;" and "the degree to which the action may establish a precedent for future actions with significant effects or represents a

decision in principle about a future consideration." 40 C.F.R. §§ 1508.27(b)(4), (b)(5), (b)(6). If the USAF's action is environmentally "significant" according to any one of these criteria, the USAF erred in failing to prepare an EIS.

According to Plaintiffs, proper consideration of these factors would have revealed substantial questions about whether the Urban CAS training program would have a significant effect on the environment, thus requiring the USAF to prepare an EIS. The USAF argues, however, that it appropriately considered the context and intensity of the Urban CAS training program.

NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), guide the Court's review of an agency's determination of "significance." *See* 40 C.F.R. § 1508.27; *see also Marsh*, 490 U.S. at 372 (CEQ regulations entitled to substantial deference). To determine whether a proposed project will have "significant" impacts on the environment, an agency must consider the context of its action, and evaluate its intensity.

Context requires that the significance of an action "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Context delimits the scope of the agency's action, including the interests affected. Intensity relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

### (1)    *Context*

The CEQ regulations explain that the proposed federal action must be analyzed with regard to several contexts—national, regional, and local—as well as by looking at the short- and long-term effects of the proposed action. *Pub. Citizen v. Dep't of Transp*., 316 F.3d 1002, 1023 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004); 40 C.F.R. § 1508.27(a).

The USAF argues that the context of the Urban CAS training program counsels against a finding of significance. The USAF asserts that the proposed action involves a maximum of 160 annual training days each year, divided between eight urban centers and the MHAFB. AR 00039. Taking Boise as an example, the USAF anticipates that it will conduct two 60- to 90-minute training events over Boise 45 days out of the year and 15 nights out of the year. AR 00039. The USAF argues that understanding the limited scope of the training program is critical for placing it in context.

In response, Plaintiffs note that the EA leaves room for conducting many more exercises over Boise than the USAF claims in its briefing, because Boise is the largest urban area and provides the features most sought for Urban CAS training. AR 00020 (noting that "ideally" the action would distribute the training exercises). Plaintiffs contend that "surge level" training, as described in the EA, would increase the anticipated effects, such that during surge levels, 40 of the anticipated annual training events would involve two day and two night training operations, resulting in a maximum of 6 hours of dedicated flight activities over an urban center. AR 00023.

The administrative record reflects that the USAF intentionally assumed the maximum level (i.e., 260) of training events per year for each urban center, which would enable "operational flexibility to bump the number of training events up or down at any of the urban centers every year." AR 20319. And, the record reflects that there may be periods when operational surges would be required, which would most likely occur every three years. AR 20319. The potential for surge levels was disclosed in the EA, with the example that Boise and other urban centers could expect 160 total training events (or 400 training operations) during surge levels. AR 00039 - 00040.

The USAF's argument that the training program, once placed in context, will have a limited impact falls apart when considered against the backdrop of the administrative record. The USAF admits it wanted the flexibility to conduct all training events over one urban center, and the ability to do so during surge levels coinciding with expected deployments. Thus, the impacts may be substantially greater upon particular urban centers at certain times, and constitute a basis for the Court's finding that there will be a significant impact.

### (2)   *Intensity Factors*

#### i.   *Controversy*

Plaintiffs argue that the USAF failed to evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). To be considered "controversial," there must be "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1993);

*Sierra Club v. United States Forest Service*, 843 F.2d 1190 (9th Cir. 1988). Put another way, a proposal can be considered controversial if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (quoting *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1539 (9th Cir. 1997)).

> A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions. NEPA then places the burden on the agency to come forward with a 'well-reasoned explanation' demonstrating why those responses disputing the EA's conclusions 'do not suffice to create a public controversy based on potential environmental consequences.' The term 'well reasoned explanation' is simply a less direct way of saying that the explanation must be 'convincing.'

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (cleaned up) (citing *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 401 (9th Cir. 1988), *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000)).

Here, 87 percent of people commenting upon the Proposed Action opposed the Project, and 63 percent provided substantive criticism. The "volume of negative comment is more than sufficient to meet the outpouring of public protest." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736. Plaintiffs therefore meet the first requirement. *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1027 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004).

*Nat'l Parks* next requires a showing that the "dispute goes beyond a disagreement of qualified experts over the reasoned conclusions as to what the data reveal." 241 F.3d at

736 – 737. There, the court explained that the Parks Service, in response to challenges

over the anticipated effects of the project upon the environment, lacked sufficient data to

support the agency's conclusion. *Id.*

As discussed above, Plaintiffs have identified serious gaps in the USAF's analyses

concerning the effects of noise from the proposed action, both with respect to the USAF's

methodology, and the assessment of noise impacts upon the community and upon birds

and wildlife. The Court therefore finds Plaintiffs have raised a substantial question

regarding the controversial nature of the Urban CAS training program, and that the USAF

has not presented a convincing explanation in support of its reasoning.

This factor therefore favors preparation of an EIS.

### ii.    Uncertainty

A project may have significant environmental impacts where its effects are

"highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5).

Plaintiffs contend that a key source of uncertainty involves the absence of baseline noise

data actually measuring the ambient noise levels in the affected communities. Plaintiffs

argue that the use of estimates begets uncertainty, because aircraft noise may be more

intrusive than what is set forth in the EA. The USAF argues that no evidence, raised prior

to the preparation of the EA, cast doubt upon the reasonableness of the USAF's

conclusion regarding noise impacts.

The USAF's argument is belied by contradictory evidence in the record that, prior

to conducting an analysis, and following a preliminary run-through with operational data,

the USAF knew that an F-15E "will be clearly audible to individuals in the ground," and

"communities could expect substantial changes in the level of noise in their ambient environments. Group consensus was that these changes would be especially concerning in the small, rural communities….Additional data would be needed to either clarify and refine the analyses or to determine and incorporate another implementing alternative." AR 20437.

Second, the DOD technical bulletin relied upon by the USAF to evaluate noise metrics indicated its scope was limited to measuring noise in the communities around civilian airports and military facilities. The specific metrics for evaluating noise impacts upon speech and sleep indicated they applied when considering noise impacts indoors. Yet, the 30 NM CAS wheel was comprised of outdoor space and recreational areas, in which noise may be experienced differently.

Last, the baseline noise estimate standard utilized by the USAF in the EA contains express limitations, specifically that the table and formula relating population density to day-night average sound level should not be used when predicted DNL is between 50 and 70 dB. AR 09851. Yet, the small urban centers were assumed to have a DNL of less than 50. The medium urban centers, which were assumed to have a DNL of 52 dBA, had a level quite close to the low end of the range, thus calling into question the use of the DNL estimate given the likelihood that areas within the 30 NM CAS wheel would likely have a DNL of less than 50. And finally, no consideration was given to the potentially amplified noise impacts upon recreational land surrounding Boise or other areas. The uncertainty of noise impacts and concerns with respect to the metrics used were raised prior to preparation of the EA. AR 00411 – 00415.

**MEMORANDUM DECISION AND ORDER - 50**

The administrative record establishes that there are "substantial questions" raised, and the level of uncertainty constitutes a basis for a finding that there may be a significant impact sufficient to set aside the FONSI. *See Anderson v. Evans*, 314 F.3d 1006, 1018 (9th Cir. 2002).

This factor also supports the preparation of an EIS.

### iii.    Precedent

If approval of a single action will establish a precedent for other actions which may cumulatively have a negative impact on the environment, an EIS may be required. *See* 40 C.F.R. § 1508.27(b)(6). Plaintiffs argue that the approval of the Urban CAS training program could have such a significant precedential impact on future proposals by the USAF to conduct similar projects elsewhere, without adequate environmental review. The USAF counters that the analyses here would not be binding upon USAF analyses of other similar programs elsewhere.

The USAF is correct that approval of Urban CAS training outside of MHAFB is not binding upon future USAF decisions regarding training in other locations. As the Ninth Circuit has noted, "EAs are usually highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140–41 (9th Cir .2011). Approval of Urban CAS training outside of MHAFB is not binding, therefore, upon future USAF decisions to conduct similar trainings in other locations.

Nonetheless, Plaintiffs have raised substantial questions with respect to the precedential nature of this action. AR 13976, 22610, 20342. The USAF documented that

the EA in this matter is "poised to be a template document for other installations." AR 20342. By using DNL estimates based upon population, sound metrics more suited to evaluating noise impacts from a fixed location, such as an airport, and failing to identify or discuss the noise impacts upon unique populations or locations (i.e., specific birds or wildlife, or the Boise Foothills recreation area), the conclusions reached in this EA are easily replicated at other locations. Considering the metrics used, and the environmental resources that were not identified, there would be no need to conduct a rigorous, site specific analysis that measures actual baseline ambient noise levels or adequately considers the noise impacts upon sleep, speech, and birds and wildlife present in other locations.

The Court therefore finds this factor supports the preparation of an EIS.

## CONCLUSION

The Court finds the USAF acted arbitrarily and capriciously in concluding that the Urban CAS training program will not significantly affect noise levels in the identified urban centers, and failed to supply a convincing statement of reasons or take the requisite "hard look" at the potential environmental impacts of the project as they relate to noise impacts upon the nine areas under consideration. The Court finds fault with the evidence considered and analyzed in reaching the conclusions regarding the Urban CAS training program as they relate to the impact of noise upon people, birds, and wildlife that inhabit the nine urban centers chosen for Urban CAS training operations.

As to the question of whether an EIS should have been prepared, the Court finds in favor of the Plaintiffs regarding their concerns about the effects of noise resulting from the Urban CAS training program upon the nine urban centers chosen for military training operations. The discussion above shows that the context and intensity of the proposed action raises substantial questions whether the USAF's Urban CAS training program is environmentally significant. The Court therefore finds that the USAF must prepare an EIS that will comprehensively evaluate the impacts of noise from the Urban CAS training program.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)    Plaintiffs' Motion for Summary Judgment (Dkt. 18) is **GRANTED**.

2)    Defendant's Motion to Strike (Dkt. 22) is **DENIED**.

3)    Defendant's Motion for Summary Judgment (Dkt. 24) is **DENIED**.

4)    The Decision Notice and Finding of No Significant Impact is hereby
      reversed and remanded to the United States Department of the Air Force for
      preparation of an environmental impact statement under NEPA consistent
      with this decision.

DATED: October 1, 2020

Honorable Candy W. Dale
United States Magistrate Judge